**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| SETH HETTENA, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 22-3589 (ABJ) |
| | ) | |
| v. | ) | |
| | ) | |
| CENTRAL INTELLIGENCE AGENCY, | ) | |
| | ) | |
| Defendant. | ) | |

**DECLARATION OF SETH HETTENA**

I, Seth Hettena, make the following declaration.

1. I am over the age of 18 and am competent to provide this declaration.

2. The following statements are made on my personal and professional knowledge and, if sworn as a witness, I can testify competently thereto.

3. I am an author and an investigative journalist. Formerly a reporter for the Associated Press, my work has been featured in The New Yorker, Rolling Stone, The New York Times, The New Republic, and the Los Angeles Times. I have also written two books.

4. I have a long-term journalistic interest in the death of Manadel al-Jamadi. I published multiple stories on the topic in the mid-2000s and attended pre-trial hearings of Navy SEALs accused of abusing al-Jamadi and the court martial of a Navy SEAL platoon commander who was acquitted for crimes allegedly committed in connection with al-Jamadi's death. I am writing a book about al-Jamadi's death and its aftermath, and I made the FOIA requests in this case as research for that project.

5. I filed this suit after the CIA violated FOIA by failing to respond to my requests within the statutorily required 20 business days.

6. In response to my FOIA request, the CIA produced four redacted documents, two of which I am contesting in my present motion for summary judgment. The redactions obscure all their substantive content.

7. The first document is entitled "Report and Recommendation of the Special Accountability Board Regarding the Death of Iraqi Detainee Al-Jamaidi" (the "Board Report"). A true and correct copy of the Board Report, as it was produced to me, is attached as Exhibit 1.

8. The second document is entitled "Comments on Report and Recommendation of the Special Accountability Board Regarding the Death of Iraqi Detainee Manadal al-Jamaidi (2003-7423-IG)" (the "Comments"). A true and correct copy of the Comments, as they were produced to me, is attached as Exhibit 2.

9. In response to a FOIA request not at issue in this case, the CIA produced a redacted version of a report by its Office of Inspector General investigating al-Jamadi's death and its aftermath (the "IG Report"). It removed certain redactions to the IG Report in response to arguments I made in a separate lawsuit. A true and correct copy of the less-redacted copy of the IG Report, as it was produced to me, is attached as Exhibit 3.

10. The Court extended my briefing deadlines in this case so that the CIA could re-review its redactions to the Board Report and the Comments in light of the redactions it removed from the IG Report. My counsel informed me that, on June 20, 2024, the CIA indicated that it would not be removing any redactions from the Board Report or the Comments.

11. The CIA has officially released other documents related to al-Jamadi's death.

12. On April 1, 2005, the Director of Central Intelligence issued an order declassifying various facts related to al-Jamadi. The document was approved for release in April, 2008. A true and correct copy of the declassification order is attached as Exhibit 4.

13. The ACLU has used FOIA to amass a collection of records from the CIA and other agencies pertaining to the War on Terror. They are compiled on a website known as the "Torture Database." For each document posted on the Torture Database, the website indicates the FOIA request and agency from which the ACLU obtained the document.

14. According to the Torture Database, on January 14, 2014, the CIA released under FOIA a copy of statements made by CIA witnesses to al-Jamadi's interrogation.[1] These statements were made in connection with the CIA Inspector General's investigation memorialized in the IG Report. A true and correct copy of these statements is attached as Exhibit 5.

15. The CIA published comments on a report issued by the Senate Select Committee on Intelligence concerning its detention program. True and correct excerpts of those comments are attached as Exhibit 6.

16. Given the CIA's disclosures referenced above, I expect that the Board Report and the Comments discuss the CIA Inspector General's findings as to whether CIA officers committed crimes in the aftermath of al-Jamadi's death. It would be hugely informative for my reporting to understand the Inspector General's conclusion as to whether any crimes were committed. This would remain true even if the nature of the crimes were redacted.

17. Given the CIA's disclosures referenced above, I expect that the Board Report and the Comments discuss whether the CIA Office of Inspector General exhibited bias or committed other misconduct in the investigation culminating in the IG Report. It would be hugely informative

---

[1] *See* https://www.thetorturedatabase.org/document/cia-copy-agents-investigation-report-manadel-al-jamadi?search_url=search/apachesolr_search&search_args=page=1%26filters=im_cck_field_doc_detainees:996.

for my reporting to understand whether such bias or misconduct occurred. This would remain true even if details surrounding the bias or misconduct were redacted.

18. The CIA has claimed that releasing certain information from the Board Report would allow the public to compare recommendations made in the Board Report with the CIA's eventual decision. *See* Williams Decl. ¶ 43, ECF No. 17-2. I am not aware of any CIA disclosures regarding its eventual decision, if any, in response to the Board Report or the Comments. Given my experience reporting on al-Jamadi, I would be aware if any such disclosures existed.

I declare under penalty of perjury that the foregoing is true and correct. Executed on July 3, 2024.

[signature]

Seth Hettena

Approved for Release: 2023/06/16 C07003166

**Exhibit 1**

~~SECRET//NOFORN~~//20320509

INSPECTOR GENERAL
2007-0401

AIG/INV

DAC-05619-2006

MEMORANDUM FOR: Associate Deputy Director, Central Intelligence Agency

FROM: [redacted] (b)(3) CIAAct (b)(6)
Chief, Center for Studies in Intelligence

SUBJECT: ~~(S//NF)~~ Report and Recommendation of the Special Accountability Board Regarding the Death of Iraqi Detainee Al-Jamaidi

[redacted]

(b)(1)
(b)(3) CIAAct
(b)(3) NatSecAct
(b)(5)

[redacted]

(b)(3) CIAAct
(b)(3) NatSecAct

C27 1

~~SECRET//NOFORN~~//20320509

Approved for Release: 2023/06/16 C07003166

SUBJECT: ~~(S//NF)~~ Report and Recommendation of the Special Accountability Board Regarding the Death of Iraqi Detainee Al-Jamaidi

(b)(1)
(b)(3) CIAAct
(b)(3) NatSecAct
(b)(5)
(b)(6)
(b)(7)(c)







C27 2

Approved for Release: 2023/06/16 C07003166



SUBJECT: ~~(S//NF)~~ Report and Recommendation of the Special Accountability Board Regarding the Death of Iraqi Detainee Al-Jamaidi

(b)(1)
(b)(3) CIAAct
(b)(3) NatSecAct
(b)(5)
(b)(6)
(b)(7)(c)





Approved for Release: 2023/06/16 C07003166

C27 3

Approved for Release: 2023/06/16 C07003166



SUBJECT: ~~(S//NF)~~ Report and Recommendation of the Special Accountability Board Regarding the Death of Iraqi Detainee Al-Jamaidi

(b)(1)
(b)(3) CIAAct
(b)(3) NatSecAct
(b)(5)
(b)(6)
(b)(7)(c)



C27 4

Approved for Release: 2023/06/16 C07003166

Approved for Release: 2023/06/16 C07003166



SUBJECT: (~~S//NF~~) Report and Recommendation of the Special Accountability Board Regarding the Death of Iraqi Detainee Al-Jamaidi

(b)(1)
(b)(3) CIAAct
(b)(3) NatSecAct
(b)(5)
(b)(6)
(b)(7)(c)





Approved for Release: 2023/06/16 C07003166

C275

SUBJECT: ~~(S//NF)~~ Report and Recommendation of the Special Accountability Board Regarding the Death of Iraqi Detainee Al-Jamaidi

(b)(1)
(b)(3) CIAAct
(b)(3) NatSecAct
(b)(5)
(b)(6)
(b)(7)(c)

[redacted]

Approved for Release: 2023/06/16 C07003166



SUBJECT: ~~(S//NF)~~ Report and Recommendation of the Special Accountability Board Regarding the Death of Iraqi Detainee Al-Jamaidi

(b)(1)
(b)(3) CIAAct
(b)(3) NatSecAct
(b)(5)
(b)(6)
(b)(7)(c)

[redacted]



C27 7

Approved for Release: 2023/06/16 C07003166

SUBJECT: ~~(S//NF)~~ Report and Recommendation of the Special Accountability Board Regarding the Death of Iraqi Detainee Al-Jamaidi

[redacted]

(b)(1)
(b)(3) CIAAct
(b)(3) NatSecAct
(b)(5)
(b)(6)
(b)(7)(c)

Approved for Release: 2023/06/16 C07003166



SUBJECT: ~~(S//NF)~~ Report and Recommendation of the Special Accountability Board Regarding the Death of Iraqi Detainee Al-Jamaidi

(b)(1)
(b)(3) CIAAct
(b)(3) NatSecAct
(b)(5)
(b)(6)
(b)(7)(c)



C279

Approved for Release: 2023/06/16 C07003166

Approved for Release: 2023/06/16 C07003166



SUBJECT: ~~(S//NF)~~ Report and Recommendation of the Special Accountability Board Regarding the Death of Iraqi Detainee Al-Jamaidi

[redacted]

(b)(1)
(b)(3) CIAAct
(b)(3) NatSecAct
(b)(5)
(b)(6)
(b)(7)(c)



C27 10

Approved for Release: 2023/06/16 C07003166

Approved for Release: 2023/06/16 C07003166



SUBJECT: (S//NF) Report and Recommendation of the Special Accountability Board Regarding the Death of Iraqi Detainee Al-Jamaidi

[redacted]

(b)(1)
(b)(3) CIAAct
(b)(3) NatSecAct
(b)(5)
(b)(6)
(b)(7)(c)





C27 11

Approved for Release: 2023/06/16 C07003166

Approved for Release: 2023/06/16 C07003166



SUBJECT: ~~(S//NF)~~ Report and Recommendation of the Special Accountability Board Regarding the Death of Iraqi Detainee Al-Jamaidi

(b)(1)
(b)(3) CIAAct
(b)(3) NatSecAct
(b)(5)
(b)(6)
(b)(7)(c)



C27 6

Approved for Release: 2023/06/16 C07003166

Approved for Release: 2023/06/16 C07003166



SUBJECT: ~~(S//NF)~~ Report and Recommendation of the Special Accountability Board Regarding the Death of Iraqi Detainee Al-Jamaidi

(b)(1)
(b)(3) CIAAct
(b)(3) NatSecAct
(b)(5)
(b)(6)
(b)(7)(c)





Approved for Release: 2023/06/16 C07003166

C27 13

Approved for Release: 2023/06/16 C07003166



SUBJECT: ~~(S//NF)~~ Report and Recommendation of the Special Accountability Board Regarding the Death of Iraqi Detainee Al-Jamaidi

(b)(1)
(b)(3) CIAAct
(b)(3) NatSecAct
(b)(5)



Approved for Release: 2023/06/16 C07003166

C27 14

Approved for Release: 2023/06/16 C07003166



SUBJECT: ~~(S//NF)~~ Report and Recommendation of the Special Accountability Board Regarding the Death of Iraqi Detainee Al-Jamaidi

(b)(1)
(b)(3) CIAAct
(b)(3) NatSecAct
(b)(5)



C27 15

Approved for Release: 2023/06/16 C07003166

Approved for Release: 2023/06/16 C07003166



SUBJECT: ~~(S//NF)~~ Report and Recommendation of the Special Accountability Board Regarding the Death of Iraqi Detainee Al-Jamaidi

(b)(1)
(b)(3) CIAAct
(b)(3) NatSecAct
(b)(5)



C27 16

Approved for Release: 2023/06/16 C07003166

Approved for Release: 2023/06/16 C07003166



SUBJECT: ~~(S//NF)~~ Report and Recommendation of the Special Accountability Board Regarding the Death of Iraqi Detainee Al-Jamaidi

(b)(1)
(b)(3) CIAAct
(b)(3) NatSecAct
(b)(5)
(b)(6)

[redacted]



Approved for Release: 2023/06/16 C07003166

C27 17

Approved for Release: 2023/06/16 C07003166



SUBJECT: ~~(S//NF)~~ Report and Recommendation of the Special Accountability Board Regarding the Death of Iraqi Detainee Al-Jamaidi

Distribution:
Original – Addressee
1 – [redacted]
1 – [redacted]
1 – C/CIS

(b)(3) CIAAct
(b)(6)





Approved for Release: 2023/06/16 C07003166

C27 18

Approved for Release: 2023/05/22 C05500527

INV Subject

SECRET//NOFORN//20320622

**Exhibit 2**

IG 2007-0414
22 June 2007

MEMORANDUM FOR: Inspector General

(b)(3) CIAAct
(b)(6)

FROM: [redacted]
Assistant Inspector General
for Investigations

SUBJECT: (U//FOUO) Comments on Report and Recommendations of the Special Accountability Board Regarding the Death of Iraqi Detainee Manadal al-Jamaidi (2003-7423-IG)

REFERENCES: A. Memo fr ADD/CIA, Re. "Quality and Objectivity of Office of Inspector General Investigations, "dtd 15 Jun 07; DAC-0325202007

B. DAC-05619-2006, Chief, Center for Studies in Intelligence Memo, "Report and Recommendation of the Special Accountability Board Regarding the Death of Iraqi Detainee al-Jamaidi," undtd; DAC-05619-2006

C. Memo for ADD/CIA fr Chairman, Special Accountability Board, Re. "IG's Performance During the Investigation of al-Jamaidi's Death," dtd 8 Jun 07

1. (U//FOUO) This memorandum comments on issues raised in the three referenced memoranda concerning the Agency's review of accountability for the events surrounding the death of Manadal al-Jamaidi, an Iraqi detainee who died on 4 November 2003 during interrogation by CIA. These comments are divided into two sections. The first section addresses the accuracy of specific issues raised by the Accountability Board; the second section addresses more general issues raised concerning the quality and objectivity of Office of Inspector General (OIG) investigations.

[redacted]

(b)(3) CIAAct
(b)(3) NatSecAct

SECRET//NOFORN//20320622

C34 1

Approved for Release: 2023/05/22 C05500527

Approved for Release: 2023/05/22 C05500527



SUBJECT: (U~~//FOUO~~) Comments on Report and Recommendations of the Special Accountability Board Regarding the Death of Iraqi Detainee Manadal al-Jamaidi (2003-7423-IG)

**Comments on the Agency Accountability Board's Conclusions**

2. (U~~//FOUO~~) [redacted]

(b)(1)
(b)(3) CIAAct
(b)(3) NatSecAct
(b)(7)(e)



0342

Approved for Release: 2023/05/22 C05500527

Approved for Release: 2023/05/22 C05500527



SUBJECT: (U/~~/FOUO~~) Comments on Report and Recommendations of the Special Accountability Board Regarding the Death of Iraqi Detainee Manadal al-Jamaidi (2003-7423-IG)

[redacted]

(b)(1)
(b)(3) CIAAct
(b)(3) NatSecAct
(b)(7)(e)

3. [redacted]

(b)(1)
(b)(3) CIAAct
(b)(3) NatSecAct
(b)(7)(e)



C343

Approved for Release: 2023/05/22 C05500527

Approved for Release: 2023/05/22 C05500527



SUBJECT: (U/~~/FOUO)~~ Comments on Report and Recommendations of the Special Accountability Board Regarding the Death of Iraqi Detainee Manadal al-Jamaidi (2003-7423-IG)

[redacted]

(b)(1)
(b)(3) CIAAct
(b)(3) NatSecAct
(b)(7)(e)

4. [redacted]

(b)(1)
(b)(3) CIAAct
(b)(3) NatSecAct
(b)(7)(e)



C344

Approved for Release: 2023/05/22 C05500527

Approved for Release: 2023/05/22 C05500527



SUBJECT: (U//FOUO) Comments on Report and Recommendations of the Special Accountability Board Regarding the Death of Iraqi Detainee Manadal al-Jamaidi (2003-7423-IG)

(b)(1)
(b)(3) CIAAct
(b)(3) NatSecAct
(b)(7)(e)



C34 5

Approved for Release: 2023/05/22 C05500527

SUBJECT: (U//~~FOUO~~) Comments on Report and Recommendations of the Special Accountability Board Regarding the Death of Iraqi Detainee Manadal al-Jamaidi (2003-7423-IG)

**General Issues**

5. [redacted]

(b)(1)
(b)(3) CIAAct
(b)(3) NatSecAct
(b)(7)(e)



C346

Approved for Release: 2023/05/22 C05500527



SUBJECT: (U//~~FOUO~~) Comments on Report and Recommendations of the Special Accountability Board Regarding the Death of Iraqi Detainee Manadal al-Jamaidi (2003-7423-IG)

[redacted]

(b)(1)
(b)(3) CIAAct
(b)(3) NatSecAct
(b)(7)(e)

6. [redacted]

(b)(1)
(b)(3) CIAAct
(b)(3) NatSecAct
(b)(7)(e)



C34 7

Approved for Release: 2023/05/22 C05500527

Approved for Release: 2023/05/22 C05500527



SUBJECT: (U//FOUO) Comments on Report and Recommendations of the Special Accountability Board Regarding the Death of Iraqi Detainee Manadal al-Jamaidi (2003-7423-IG)

[redacted]

(b)(1)
(b)(3) CIAAct
(b)(3) NatSecAct
(b)(7)(e)

7. (U) [redacted]

(b)(1)
(b)(3) CIAAct
(b)(3) NatSecAct
(b)(7)(e)



C34 8

Approved for Release: 2023/05/22 C05500527

SUBJECT: (U//~~FOUO~~) Comments on Report and Recommendations of the Special Accountability Board Regarding the Death of Iraqi Detainee Manadal al-Jamaidi (2003-7423-IG)

[redacted]

(b)(1)
(b)(3) CIAAct
(b)(3) NatSecAct
(b)(7)(e)

8. [redacted]

(b)(1)
(b)(3) CIAAct
(b)(3) NatSecAct
(b)(7)(e)



C349

Approved for Release: 2023/05/22 C05500527



SUBJECT: (U//~~FOUO~~) Comments on Report and Recommendations of the Special Accountability Board Regarding the Death of Iraqi Detainee Manadal al-Jamaidi (2003-7423-IG)

[redacted]

(b)(1)
(b)(3) CIAAct
(b)(3) NatSecAct
(b)(7)(e)

9. (U) Thank you for your consideration of these issues.

[redacted]

(b)(3) CIAAct
(b)(6)



C34 10

Approved for Release: 2023/05/22 C05500527

Approved for Release: 2023/05/22 C05500527



SUBJECT: (U//FOUO) Comments on Report and Recommendations of the Special Accountability Board Regarding the Death of Iraqi Detainee Manadal al-Jamaidi (2003-7423-IG)

OIG/INV/[redacted](22 June 2007)
Cases\[redacted]Memo - June 2007

Distribution:
Original - Addressee
1 - INV Chrono
1 - INV Subject File (2003-7423-IG)



C34 11

Approved for Release: 2023/05/22 C05500527

Approved for Release: 2024/01/08 C05758316

IG ✓ Chrono

Final ROI

CIA/IG LOAN COPY
DO NOT COPY

**Exhibit 3**

*Central Intelligence Agency*
*Inspector General*

# REPORT OF INVESTIGATION

# (U//~~FOUO~~) DEATH OF MANADAL AL-JAMAIDI
## (2003-7423-IG)

**3 November 2005**

*John L. Helgerson*
*Inspector General*

(b)(3) CIAAct
(b)(6)
(b)(7)(c)

[redacted]

*Assistant Inspector General*
*for Investigations*

(b)(3) CIAAct
(b)(6)
(b)(7)(c)

[redacted]

*Supervisory Special Agent*

*Special Agents*

[redacted]

(b)(3) CIAAct
(b)(6)
(b)(7)(c)

[redacted]

(b)(3) CIAAct
(b)(3) NatSecAct

~~SECRET//MR~~

Approved for Release: 2024/01/08 C05758316

# TABLE OF CONTENTS

Page

**GLOSSARY OF INDIVIDUALS** ........................................ ii

**INTRODUCTION** ........................................ 1

**SUMMARY** ........................................ 2

**BACKGROUND** ........................................ 3

**PROCEDURES AND RESOURCES** ........................................ 25

**ISSUES PRESENTED** ........................................ 26

**FINDINGS** ........................................ 26

*(U//~~FOUO~~) EVENTS SURROUNDING THE DEATH OF AL-JAMAIDI AT ABU GHURAYB PRISON* ........................................ 26

[redacted]

(b)(3) CIAAct

*(U//~~FOUO~~) FEDERAL CRIMINAL LAWS AND CIA POLICIES AND REGULATIONS RELEVANT TO AGENCY PERSONNEL IN THEIR TREATMENT OF AL-JAMAIDI AND THEIR ACTIONS IN THIS INVESTIGATION* ........................................ 74

**CONCLUSIONS** ........................................ 81

**RECOMMENDATION** ........................................ 87

[redacted]

(b)(1)
(b)(3) CIAAct
(b)(3) NatSecAct
(b)(6)
(b)(7)(c)
(b)(7)(d)

| | |
|---|---|
| Al-Jamaidi, Manadal | Former Iraqi Army captain, cell leader of group believed to be planning attacks against coalition forces, died hours after capture by US forces on 4 November 2003. |

[redacted]

(b)(1)
(b)(3) CIAAct
(b)(3) NatSecAct
(b)(6)
(b)(7)(c)
(b)(7)(d)

Approved for Release: 2024/01/08 C05758316

(b)(1)
(b)(3) CIAAct
(b)(3) NatSecAct
(b)(6)
(b)(7)(c)
(b)(7)(d)

Page Denied

Approved for Release: 2024/01/08 C05758316

Approved for Release: 2024/01/08 C05758316

(b)(1)
(b)(3) CIAAct
(b)(3) NatSecAct
(b)(6)
(b)(7)(c)
(b)(7)(d)

Page Denied

Approved for Release: 2024/01/08 C05758316

(b)(1)
(b)(3) CIAAct
(b)(3) NatSecAct
(b)(6)
(b)(7)(c)
(b)(7)(d)

Page Denied

Approved for Release: 2024/01/08 C05758316

(b)(1)
(b)(3) CIAAct
(b)(3) NatSecAct
(b)(6)
(b)(7)(c)
(b)(7)(d)

Page Denied

Approved for Release: 2024/01/08 C05758316


*OFFICE OF INSPECTOR GENERAL*
*INVESTIGATIONS STAFF*

# REPORT OF INVESTIGATION

## (U//~~FOUO~~) DEATH OF MANADAL AL-JAMAIDI (2003-7423-IG)

**3 November 2005**

## INTRODUCTION

1. ~~(S)~~ On 4 November 2003, [redacted] notified the Office of Inspector General (OIG) that an Iraqi detainee had died that day while being interrogated by [redacted] at Abu Ghurayb Prison near Baghdad. The detainee was Manadal Al-Jamaidi,[1] who was captured by Navy Sea, Air, Land (SEAL) Team 7 (ST-7) personnel during a raid on his residence in [redacted] Iraq, earlier that day. He was transported to the ST-7 compound at Baghdad International Airport (BIAP) for battlefield interrogation. [redacted] transported Al-Jamaidi to Abu Ghurayb Prison where he died approximately two hours later. The medical examiner ruled Al-Jamaidi's death a homicide.

(b)(3) CIAAct (b)(6) (b)(7)(c)

(b)(3) CIAAct (b)(6) (b)(7)(c)

(b)(1) (b)(3) CIAAct (b)(3) NatSecAct

(b)(1) (b)(3) NatSecAct

---

[redacted]

(b)(1) (b)(3) NatSecAct



Approved for Release: 2024/01/08 C05758316

## SUMMARY

2. ~~(S)~~ On 4 November 2003, members of ST-7 and [redacted] (b)(1) (b)(3) CIAAct (b)(3) NatSecAct [redacted] personnel conducted a mission to apprehend Manadal Al-Jamaidi. Al-Jamaidi reportedly had at his disposal two tons of [redacted] (b)(1) (b)(3) CIAAct (b)(3) NatSecAct explosive [redacted] (b)(1) (b)(3) NatSecAct Al-Jamaidi was captured at his residence in [redacted] Baghdad, and transported by ST-7 personnel to their compound at BIAP for initial interrogation by Agency officers. In route to BIAP, Al-Jamaidi was physically abused by ST-7 personnel, who also posed for unofficial photographs with the injured prisoner. Al-Jamaidi was interrogated for approximately one hour at the ST-7 compound before being transported [redacted] (b)(1) (b)(3) NatSecAct [redacted] (b)(1) (b)(3) NatSecAct to Abu Ghurayb Prison for further questioning.

[redacted] (b)(1) (b)(3) CIAAct (b)(3) NatSecAct Upon arrival at the prison, he was escorted by Army personnel to a shower room where, at the request of the Agency interrogator, Al-Jamaidi was secured by handcuffs to a barred window for interrogation. Al-Jamaidi died approximately one hour later while being interrogated. An autopsy determined the death resulted from blunt force injuries to the torso complicated by compromised respiration. The deputy medical examiner ruled the death a homicide.

[redacted] (b)(1) (b)(3) CIAAct (b)(3) NatSecAct The deputy medical examiner concluded that the position in which Al-Jamaidi was placed during the interrogation exacerbated his otherwise serious but non-life-threatening internal injuries and compromised his breathing.

Approved for Release: 2024/01/08 C05758316

(b)(1)
(b)(3) CIAAct
(b)(3) NatSecAct
(b)(6)
(b)(7)(c)
(b)(7)(d)

Page Denied

Approved for Release: 2024/01/08 C05758316

Approved for Release: 2024/01/08 C05758316

(b)(1)
(b)(3) CIAAct
(b)(3) NatSecAct
(b)(6)
(b)(7)(c)
(b)(7)(d)

Page Denied

Approved for Release: 2024/01/08 C05758316

(b)(1)
(b)(3) CIAAct
(b)(3) NatSecAct
(b)(6)
(b)(7)(c)
(b)(7)(d)

Page Denied

Approved for Release: 2024/01/08 C05758316

Approved for Release: 2024/01/08 C05758316

(b)(1)
(b)(3) CIAAct
(b)(3) NatSecAct
(b)(6)
(b)(7)(c)
(b)(7)(d)

Page Denied

Approved for Release: 2024/01/08 C05758316

(b)(1)
(b)(3) CIAAct
(b)(3) NatSecAct
(b)(6)
(b)(7)(c)
(b)(7)(d)

Page Denied

Approved for Release: 2024/01/08 C05758316

Approved for Release: 2024/01/08 C05758316

(b)(1)
(b)(3) CIAAct
(b)(3) NatSecAct
(b)(6)
(b)(7)(c)
(b)(7)(d)

Page Denied

Approved for Release: 2024/01/08 C05758316

(b)(1)
(b)(3) CIAAct
(b)(3) NatSecAct
(b)(6)
(b)(7)(c)
(b)(7)(d)

Page Denied

Approved for Release: 2024/01/08 C05758316

(b)(1)
(b)(3) CIAAct
(b)(3) NatSecAct
(b)(6)
(b)(7)(c)
(b)(7)(d)

Page Denied

Approved for Release: 2024/01/08 C05758316

Approved for Release: 2024/01/08 C05758316

(b)(1)
(b)(3) CIAAct
(b)(3) NatSecAct
(b)(6)
(b)(7)(c)
(b)(7)(d)

Page Denied

Approved for Release: 2024/01/08 C05758316

Approved for Release: 2024/01/08 C05758316

(b)(1)
(b)(3) CIAAct
(b)(3) NatSecAct
(b)(6)
(b)(7)(c)
(b)(7)(d)

Page Denied

Approved for Release: 2024/01/08 C05758316

Approved for Release: 2024/01/08 C05758316

(b)(1)
(b)(3) CIAAct
(b)(3) NatSecAct
(b)(6)
(b)(7)(c)
(b)(7)(d)

Page Denied

Approved for Release: 2024/01/08 C05758316

(b)(1)
(b)(3) CIAAct
(b)(3) NatSecAct
(b)(6)
(b)(7)(c)
(b)(7)(d)

Page Denied

Approved for Release: 2024/01/08 C05758316

(b)(1)
(b)(3) CIAAct
(b)(3) NatSecAct
(b)(6)
(b)(7)(c)
(b)(7)(d)

Page Denied

Approved for Release: 2024/01/08 C05758316

Approved for Release: 2024/01/08 C05758316

(b)(1)
(b)(3) CIAAct
(b)(3) NatSecAct
(b)(6)
(b)(7)(c)
(b)(7)(d)

Page Denied

Approved for Release: 2024/01/08 C05758316

(b)(1)
(b)(3) CIAAct
(b)(3) NatSecAct
(b)(6)
(b)(7)(c)
(b)(7)(d)

Page Denied

Approved for Release: 2024/01/08 C05758316

Approved for Release: 2024/01/08 C05758316

(b)(1)
(b)(3) CIAAct
(b)(3) NatSecAct
(b)(6)
(b)(7)(c)
(b)(7)(d)

Page Denied

Approved for Release: 2024/01/08 C05758316

Approved for Release: 2024/01/08 C05758316

(b)(1)
(b)(3) CIAAct
(b)(3) NatSecAct
(b)(6)
(b)(7)(c)
(b)(7)(d)

Page Denied

Approved for Release: 2024/01/08 C05758316

Approved for Release: 2024/01/08 C05758316

(b)(1)
(b)(3) CIAAct
(b)(3) NatSecAct
(b)(6)
(b)(7)(c)
(b)(7)(d)

Page Denied

Approved for Release: 2024/01/08 C05758316

Approved for Release: 2024/01/08 C05758316

(b)(1)
(b)(3) CIAAct
(b)(3) NatSecAct
(b)(6)
(b)(7)(c)
(b)(7)(d)

Page Denied

Approved for Release: 2024/01/08 C05758316

(b)(1)
(b)(3) CIAAct
(b)(3) NatSecAct
(b)(6)
(b)(7)(c)
(b)(7)(d)

Page Denied

Approved for Release: 2024/01/08 C05758316

(b)(1)
(b)(3) CIAAct
(b)(3) NatSecAct
(b)(6)
(b)(7)(c)
(b)(7)(d)

Page Denied

Approved for Release: 2024/01/08 C05758316

Approved for Release: 2024/01/08 C05758316

(b)(1)
(b)(3) CIAAct
(b)(3) NatSecAct
(b)(6)
(b)(7)(c)
(b)(7)(d)

Page Denied

Approved for Release: 2024/01/08 C05758316

[redacted]

(b)(1)
(b)(3) CIAAct
(b)(3) NatSecAct
(b)(6)
(b)(7)(c)
(b)(7)(d)

# PROCEDURES AND RESOURCES

63. ~~(S)~~ OIG coordinated its investigation into the death of Al-Jamaidi with Army CID [redacted] as well as the NCIS at its Washington, D.C. headquarters [redacted]

(b)(1)
(b)(3) CIAAct
(b)(3) NatSecAct

# ISSUES PRESENTED

66. (U/~~/FOUO~~) This Report addresses the following issues:

- Events surrounding the death of Al-Jamaidi at Abu Ghurayb Prison.

[redacted]

(b)(3) CIAAct

- Federal criminal laws and CIA policies and regulations relevant to Agency personnel in their treatment of Al-Jamaidi and in their actions in this investigation.

# FINDINGS

***(U/~~/FOUO~~) EVENTS SURROUNDING THE DEATH OF AL-JAMAIDI AT ABU GHURAYB PRISON***

[redacted]

(b)(1)
(b)(3) CIAAct
(b)(3) NatSecAct
(b)(6)
(b)(7)(c)
(b)(7)(d)

Approved for Release: 2024/01/08 C05758316

(b)(1)
(b)(3) CIAAct
(b)(3) NatSecAct
(b)(6)
(b)(7)(c)
(b)(7)(d)

Page Denied

Approved for Release: 2024/01/08 C05758316

(b)(1)
(b)(3) CIAAct
(b)(3) NatSecAct
(b)(6)
(b)(7)(c)
(b)(7)(d)

Page Denied

Approved for Release: 2024/01/08 C05758316

(b)(1)
(b)(3) CIAAct
(b)(3) NatSecAct
(b)(6)
(b)(7)(c)
(b)(7)(d)

Page Denied

Approved for Release: 2024/01/08 C05758316

Approved for Release: 2024/01/08 C05758316

(b)(1)
(b)(3) CIAAct
(b)(3) NatSecAct
(b)(6)
(b)(7)(c)
(b)(7)(d)

Page Denied

Approved for Release: 2024/01/08 C05758316

Approved for Release: 2024/01/08 C05758316

(b)(1)
(b)(3) CIAAct
(b)(3) NatSecAct
(b)(6)
(b)(7)(c)
(b)(7)(d)

Page Denied

Approved for Release: 2024/01/08 C05758316

Approved for Release: 2024/01/08 C05758316

(b)(1)
(b)(3) CIAAct
(b)(3) NatSecAct
(b)(6)
(b)(7)(c)
(b)(7)(d)

Page Denied

Approved for Release: 2024/01/08 C05758316

(b)(1)
(b)(3) CIAAct
(b)(3) NatSecAct
(b)(6)
(b)(7)(c)
(b)(7)(d)

Page Denied

Approved for Release: 2024/01/08 C05758316

Approved for Release: 2024/01/08 C05758316

(b)(1)
(b)(3) CIAAct
(b)(3) NatSecAct
(b)(6)
(b)(7)(c)
(b)(7)(d)

Page Denied

[redacted]

(b)(1)
(b)(3) CIAAct
(b)(3) NatSecAct
(b)(6)
(b)(7)(c)
(b)(7)(d)

86. ~~(C)~~ None of the CID interview reports of military personnel indicate that CIA officers left the shower room during the interrogation of Al-Jamaidi. [redacted]

(b)(1)
(b)(3) NatSecAct
(b)(6)
(b)(7)(c)
(b)(7)(d)

[redacted]

(b)(1)
(b)(3) CIAAct
(b)(3) NatSecAct
(b)(6)
(b)(7)(c)
(b)(7)(d)

(b)(1)
(b)(3) CIAAct
(b)(3) NatSecAct
(b)(6)
(b)(7)(c)
(b)(7)(d)

Page Denied

Approved for Release: 2024/01/08 C05758316

Approved for Release: 2024/01/08 C05758316

(b)(1)
(b)(3) CIAAct
(b)(3) NatSecAct
(b)(6)
(b)(7)(c)
(b)(7)(d)

Page Denied

Approved for Release: 2024/01/08 C05758316

Approved for Release: 2024/01/08 C05758316

(b)(1)
(b)(3) CIAAct
(b)(3) NatSecAct
(b)(6)
(b)(7)(c)
(b)(7)(d)

Page Denied

Approved for Release: 2024/01/08 C05758316

Approved for Release: 2024/01/08 C05758316

(b)(1)
(b)(3) CIAAct
(b)(3) NatSecAct
(b)(6)
(b)(7)(c)
(b)(7)(d)

Page Denied

Approved for Release: 2024/01/08 C05758316

Approved for Release: 2024/01/08 C05758316

(b)(1)
(b)(3) CIAAct
(b)(3) NatSecAct
(b)(6)
(b)(7)(c)
(b)(7)(d)

Page Denied

Approved for Release: 2024/01/08 C05758316

(b)(1)
(b)(3) NatSecAct
(b)(6)
(b)(7)(c)
(b)(7)(d)

Page Denied

Approved for Release: 2024/01/08 C05758316

(b)(1)
(b)(3) CIAAct
(b)(3) NatSecAct
(b)(6)
(b)(7)(c)
(b)(7)(d)

Page Denied

Approved for Release: 2024/01/08 C05758316

Approved for Release: 2024/01/08 C05758316

(b)(1)
(b)(3) CIAAct
(b)(3) NatSecAct
(b)(6)
(b)(7)(c)
(b)(7)(d)

Page Denied

Approved for Release: 2024/01/08 C05758316

(b)(1)
(b)(3) CIAAct
(b)(3) NatSecAct
(b)(6)
(b)(7)(c)
(b)(7)(d)

Page Denied

Approved for Release: 2024/01/08 C05758316

(b)(1)
(b)(3) CIAAct
(b)(3) NatSecAct
(b)(6)
(b)(7)(c)
(b)(7)(d)

108. (U~~//FOUO~~) A final autopsy report was issued on 9 January 2004. Specifically, the deputy medical examiner wrote in his Opinion:

> External injuries are consistent with injuries sustained during apprehension. Ligature injuries are present on the wrists and ankles. Fractures of the ribs and a contusion of the left lung imply significant blunt force injuries of the thorax and likely resulted in impaired respiration. According to investigating agents, interviews taken from individuals present at the prison during the interrogation indicate that a hood made of synthetic material was placed over the head and neck of the detainee.[15] This likely resulted in further compromise of effective respiration. Mr. Al-Jamaidi was not under the influence of drugs of abuse or ethanol at the time of death. The cause of death is blunt force injuries of the torso complicated by compromised respiration. The manner of death is homicide.

(b)(1)
(b)(3) CIAAct
(b)(3) NatSecAct
(b)(6)
(b)(7)(c)
(b)(7)(d)

Approved for Release: 2024/01/08 C05758316

(b)(1)
(b)(3) CIAAct
(b)(3) NatSecAct
(b)(6)
(b)(7)(c)
(b)(7)(d)

Page Denied

Approved for Release: 2024/01/08 C05758316

Approved for Release: 2024/01/08 C05758316

(b)(1)
(b)(3) CIAAct
(b)(3) NatSecAct
(b)(6)
(b)(7)(c)
(b)(7)(d)

Page Denied

Approved for Release: 2024/01/08 C05758316

(b)(1)
(b)(3) CIAAct
(b)(3) NatSecAct
(b)(6)
(b)(7)(c)
(b)(7)(d)

Page Denied

Approved for Release: 2024/01/08 C05758316

(b)(1)
(b)(3) CIAAct
(b)(3) NatSecAct
(b)(6)
(b)(7)(c)
(b)(7)(d)

Page Denied

Approved for Release: 2024/01/08 C05758316

(b)(1)
(b)(3) CIAAct
(b)(3) NatSecAct
(b)(6)
(b)(7)(c)
(b)(7)(d)

Page Denied

Approved for Release: 2024/01/08 C05758316

(b)(1)
(b)(3) CIAAct
(b)(3) NatSecAct
(b)(6)
(b)(7)(c)
(b)(7)(d)

Page Denied

Approved for Release: 2024/01/08 C05758316

(b)(1)
(b)(3) CIAAct
(b)(3) NatSecAct
(b)(6)
(b)(7)(c)
(b)(7)(d)

Page Denied

Approved for Release: 2024/01/08 C05758316

(b)(1)
(b)(3) CIAAct
(b)(3) NatSecAct
(b)(6)
(b)(7)(c)
(b)(7)(d)

Page Denied

Approved for Release: 2024/01/08 C05758316

(b)(1)
(b)(3) CIAAct
(b)(3) NatSecAct
(b)(6)
(b)(7)(c)
(b)(7)(d)

Page Denied

Approved for Release: 2024/01/08 C05758316

Approved for Release: 2024/01/08 C05758316

(b)(1)
(b)(3) CIAAct
(b)(3) NatSecAct
(b)(6)
(b)(7)(c)
(b)(7)(d)

Page Denied

Approved for Release: 2024/01/08 C05758316

Approved for Release: 2024/01/08 C05758316

(b)(1)
(b)(3) CIAAct
(b)(3) NatSecAct
(b)(6)
(b)(7)(c)
(b)(7)(d)

Page Denied

Approved for Release: 2024/01/08 C05758316

Approved for Release: 2024/01/08 C05758316

(b)(1)
(b)(3) CIAAct
(b)(3) NatSecAct
(b)(6)
(b)(7)(c)
(b)(7)(d)

Page Denied

Approved for Release: 2024/01/08 C05758316

(b)(1)
(b)(3) CIAAct
(b)(3) NatSecAct
(b)(6)
(b)(7)(c)
(b)(7)(d)

Page Denied

Approved for Release: 2024/01/08 C05758316

Approved for Release: 2024/01/08 C05758316

(b)(1)
(b)(3) CIAAct
(b)(3) NatSecAct
(b)(6)
(b)(7)(c)
(b)(7)(d)

Page Denied

Approved for Release: 2024/01/08 C05758316

(b)(1)
(b)(3) CIAAct
(b)(3) NatSecAct
(b)(6)
(b)(7)(c)
(b)(7)(d)

Page Denied

Approved for Release: 2024/01/08 C05758316

Approved for Release: 2024/01/08 C05758316

(b)(1)
(b)(3) CIAAct
(b)(3) NatSecAct
(b)(6)
(b)(7)(c)
(b)(7)(d)

Page Denied

Approved for Release: 2024/01/08 C05758316

Approved for Release: 2024/01/08 C05758316

(b)(1)
(b)(3) CIAAct
(b)(3) NatSecAct
(b)(6)
(b)(7)(c)
(b)(7)(d)

Page Denied

Approved for Release: 2024/01/08 C05758316

Approved for Release: 2024/01/08 C05758316


[redacted]

(b)(1)
(b)(3) CIAAct
(b)(3) NatSecAct
(b)(6)
(b)(7)(c)
(b)(7)(d)

The following selected paragraphs [redacted] describe Al-Jamaidi's capture and death:

Background: Subject was captured by SEAL Team Seven in an early morning (4 November 03) raid in [redacted] Subject is a former Iraqi military officer involved in anti-coalition activities. [redacted] Subject was a cell leader with access to two tons of plastic explosives. [redacted] Subject was a 43 year old Iraqi citizen.

(b)(1)
(b)(3) NatSecAct

(b)(1)
(b)(3) CIAAct
(b)(3) NatSecAct
(b)(6)
(b)(7)(c)

[redacted] first glimpse of Subject occurred when Subject was being escorted to [redacted] Subject was wearing a head cover and cuffed for security, and appeared to be resisting capture in the form of kicking and scuffling with the members of SEAL Team Seven. Once Subject was loaded into [redacted] he was transported to the SEAL Team Seven compound at BIAP at approximately 0400 to 0530 hours (local time).

(b)(3) NatSecAct

(b)(3) NatSecAct

(b)(1)
(b)(3) CIAAct
(b)(3) NatSecAct
(b)(6)
(b)(7)(c)

Upon arrival at the SEAL Team Seven compound, Subject was escorted to an interview room and placed in a chair. Subject appeared coherent and responded to [redacted] questions. [redacted]

(b)(1)
(b)(3) NatSecAct


Approved for Release: 2024/01/08 C05758316

[redacted] Subject did confirm his identity. At approximately 0530 hours to 0545 hours, Subject was loaded into [redacted] and transported to Abu Ghurayb Prison.

(b)(1)
(b)(3) CIAAct
(b)(3) NatSecAct

Once at the prison, Subject was dressed in an orange prison uniform by the Military Police assigned to the prison and escorted to a room for further questioning. For security, Subject was subsequently restrained to the bars on the window and questioning continued. Shortly after restraining Subject to the window, [redacted] moved Subject's head cover up above his mouth and nose while keeping Subject's vision restricted. Subject was maintaining a coherent conversation and never said anything about being in discomfort or in need of medical attention. After approximately one hour and a half hours of questioning (0715 local time), [redacted] observed Subject slump toward the floor. [redacted] immediately sought the assistance of the Military Police whose post was within 15 feet of the interview room. Three Military Police Officers immediately entered the room and took control of Subject. It should be noted, there were open windows to the interview room enabling the Military Police to hear the entire custodial debriefing.

(b)(1)
(b)(3) CIAAct
(b)(3) NatSecAct
(b)(6)
(b)(7)(c)

(b)(1)
(b)(3) CIAAct
(b)(3) NatSecAct
(b)(6)
(b)(7)(c)

(b)(1)
(b)(3) CIAAct
(b)(3) NatSecAct
(b)(6)
(b)(7)(c)

While Military Police assisted Subject to his feet, [redacted] observed that Subject did not appear to be breathing and the head cover was removed from Subject's eyes immediately. Once the head cover was removed, [redacted] observed that Subject had a bruised/swollen right eye. There were no other observable bruises or contusions noted on Subject's body.

(b)(1)
(b)(3) CIAAct
(b)(3) NatSecAct
(b)(6)
(b)(7)(c)

(b)(1)
(b)(3) CIAAct
(b)(3) NatSecAct
(b)(6)
(b)(7)(c)

[redacted]

(b)(1)
(b)(3) CIAAct
(b)(3) NatSecAct
(b)(6)
(b)(7)(c)

[redacted]

(b)(1)
(b)(3) CIAAct
(b)(3) NatSecAct
(b)(6)
(b)(7)(c)

[redacted]

(b)(1)
(b)(3) CIAAct
(b)(3) NatSecAct
(b)(6)
(b)(7)(c)
(b)(7)(d)

The following is a chronological summary of the capture and events ending in the subsequent death of Manadal Al-Jamaidi (Subject) on 4 November 2003. All times are approximate.

0200-0230 Subject is captured by SEAL Team 7 (ST-7). [CIA] officers remained in their vehicles during the raid. . . . Subject's

head was covered and he was wearing flexcuffs. Subject was kicking and resisting the ST-7 members who were attempting to place him into [redacted]

(b)(3) NatSecAct

0250-0330 Team transports Subject to ST-7 base for further questioning.

0340-0450 Subject is debriefed by [redacted] Subject appears coherent and responsive to [redacted] questions. Subject did not make any comments about physical distress, his health, or ask for medical attention.

(b)(1)
(b)(3) CIAAct
(b)(3) NatSecAct
(b)(6)
(b)(7)(c)

0500-0520 [redacted] While en route to the prison, Subject was coherent and made no comments about physical distress or discomfort.

(b)(1)
(b)(3) CIAAct
(b)(3) NatSecAct
(b)(6)
(b)(7)(c)

0520-0530 Subject is escorted to an initial holding cell in the prison by Military Police officers.

0530-0545 Military Police officers at Abu Ghuraib take custody of Subject and dress him in orange coveralls and remove flexcuffs. Subject was coherent and made no comments about his physical health. While Subject was being dressed, there was no evidence of injury. The head cover was not removed.

0545-0555 Subject transferred from the holding cell by Military Police officers to a debriefing cell in the section of the prison where inmates of intelligence interest are detained. For security purposes, Subject is handcuffed to an exterior window with enough slack in the chain that would enable him to kneel or stand. [redacted]

(b)(1)
(b)(3) NatSecAct

0555-0700 [redacted] conducts custodial debriefing of Subject. Immediately after being handcuffed to the window, [redacted] moved Subject head cover above his mouth and nose. There was no evidence of bleeding or injury to Subject. Subject was maintaining a coherent conversation and never said anything about being in discomfort or in need of medical attention.

(b)(1)
(b)(3) CIAAct
(b)(3) NatSecAct
(b)(6)
(b)(7)(c)

0700-0715 [redacted] observes Subject slumping toward the floor and immediately summons the Military Police officers, who arrived

(b)(1)
(b)(3) CIAAct
(b)(3) NatSecAct
(b)(6)
(b)(7)(c)

(b)(1)
(b)(3) CIAAct
(b)(3) NatSecAct
(b)(6)
(b)(7)(c)

within 20 seconds and took over. As the Military Police officers were lifting Subject, [redacted] observed that Subject did not appear to be breathing. While the Military Police Officers were holding Subject up, [redacted] immediately removed the head cover and noticed the injured right eye.

(b)(1)
(b)(3) CIAAct
(b)(3) NatSecAct
(b)(6)
(b)(7)(c)

[redacted]

(b)(1)
(b)(3) CIAAct
(b)(3) NatSecAct
(b)(6)
(b)(7)(c)

Approved for Release: 2024/01/08 C05758316

(b)(1)
(b)(3) CIAAct
(b)(3) NatSecAct
(b)(6)
(b)(7)(c)
(b)(7)(d)

Page Denied

Approved for Release: 2024/01/08 C05758316

Approved for Release: 2024/01/08 C05758316

(b)(1)
(b)(3) CIAAct
(b)(3) NatSecAct
(b)(6)
(b)(7)(c)
(b)(7)(d)

Page Denied

Approved for Release: 2024/01/08 C05758316

Approved for Release: 2024/01/08 C05758316

(b)(1)
(b)(3) CIAAct
(b)(3) NatSecAct
(b)(6)
(b)(7)(c)
(b)(7)(d)

Page Denied

Approved for Release: 2024/01/08 C05758316

Approved for Release: 2024/01/08 C05758316

(b)(1)
(b)(3) CIAAct
(b)(3) NatSecAct
(b)(6)
(b)(7)(c)
(b)(7)(d)

Page Denied

Approved for Release: 2024/01/08 C05758316

(b)(1)
(b)(3) CIAAct
(b)(3) NatSecAct
(b)(6)
(b)(7)(c)
(b)(7)(d)

Page Denied

Approved for Release: 2024/01/08 C05758316

Approved for Release: 2024/01/08 C05758316

(b)(1)
(b)(3) CIAAct
(b)(3) NatSecAct
(b)(6)
(b)(7)(c)
(b)(7)(d)

Page Denied

Approved for Release: 2024/01/08 C05758316

*(U//~~FOUO~~) FEDERAL CRIMINAL LAWS AND CIA POLICIES AND REGULATIONS POTENTIALLY RELEVANT TO AGENCY PERSONNEL IN THEIR TREATMENT OF AL-JAMAIDI AND THEIR ACTIONS IN THIS INVESTIGATION*

175. (U) **Federal criminal laws.** Four provisions of Title 18 U.S.C., *Crimes and Criminal Procedure*, could apply to the actions of CIA officers in this case. Title 18 U.S.C. §1112, *Manslaughter*, provides:

> Manslaughter is the unlawful killing of a human being without malice. . . . Involuntary—In the commission of an unlawful act not amounting to a felony, or in the commission in an unlawful manner, or without due caution and circumspection, of a lawful act which might produce death. . . . Whoever is guilty of involuntary manslaughter, shall be fined under this title or imprisoned not more than six years, or both; . . .

Title 18 U.S.C. §1001, *Statements or entries generally*, provides:

> [W]hoever, in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States, knowingly and willfully—(1) falsifies, conceals, or covers up by any trick, scheme, or device a material fact; (2) makes any materially false, fictitious, or fraudulent statement or representation . . . shall be fined under this title or imprisoned not more than 5 years, or both.

Title 18 U.S.C. §1519, *Destruction, alteration, or falsification of records in Federal investigations and bankruptcy*, provides:

> Whoever knowingly alters, destroys, mutilates, conceals, covers up, falsifies, or makes a false entry in any record, document, or tangible object with the intent to impede, obstruct, or influence the investigation or proper administration of any matter within the jurisdiction of any department or agency of the United States or any case filed under title 11, or in relation to or contemplation of any such matter or case, shall be fined under this title, imprisoned not more than 20 years, or both.

Approved for Release: 2024/01/08 C05758316


Title 18 U.S.C. §371, *Conspiracy to commit offense or to defraud United States*, provides:

> If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined under this title or imprisoned not more than five years, or both.

(b)(1)
(b)(3) CIAAct
(b)(3) NatSecAct


Approved for Release: 2024/01/08 C05758316

Approved for Release: 2024/01/08 C05758316

(b)(1)
(b)(3) CIAAct
(b)(3) NatSecAct
(b)(6)
(b)(7)(c)

Page Denied

Approved for Release: 2024/01/08 C05758316

Approved for Release: 2024/01/08 C05758316

(b)(1)
(b)(3) CIAAct
(b)(3) NatSecAct
(b)(6)
(b)(7)(c)

Page Denied

Approved for Release: 2024/01/08 C05758316

Approved for Release: 2024/01/08 C05758316

(b)(1)
(b)(3) CIAAct
(b)(3) NatSecAct
(b)(6)
(b)(7)(c)

Page Denied

Approved for Release: 2024/01/08 C05758316

Approved for Release: 2024/01/08 C05758316

(b)(1)
(b)(3) CIAAct
(b)(3) NatSecAct
(b)(6)
(b)(7)(c)
(b)(7)(d)

Page Denied

Approved for Release: 2024/01/08 C05758316

(b)(1)
(b)(3) CIAAct
(b)(3) NatSecAct
(b)(6)
(b)(7)(c)

188. (U~~//FOUO~~) Agency Regulation 13-6, Appendix I, *Standards for Employee Accountability* provides:

a. Consequences will follow an employee's failure to comply with a statute, regulation, policy or other guidance that is applicable to the employee's professional conduct or performance.

b. The lack of knowledge of a statute, regulation, policy or guidance does not necessarily excuse the employee. However, lack of knowledge may affect the level of employee responsibility and the extent to which disciplinary action is warranted. Therefore the following factors will be considered prior to holding an employee accountable for a particular act or omission:

(1) Agency efforts to make employees aware of the statute, regulation, policy or guidance;

(2) The extent of employee awareness of the statute, regulation, policy or guidance;

(3) The importance of the conduct or performance at issue;

(4) The position or grade of the employee.

c. Any finding of deficient performance must be specific and may include omissions and failure to act in accordance with a reasonable level of professionalism, skill, and diligence.

Approved for Release: 2024/01/08 C05758316


d. Determinations under the above standard will be based in part on whether the facts objectively indicate a certain action should have been taken or not taken and whether the employee had an opportunity and the responsibility to act or not act.

e. Managers may be held accountable in addition for the action(s) or inaction of subordinates even if the manager lacks knowledge of the subordinate's conduct. Such accountability depends on:

(1) Whether the manager reasonably should have been aware of the matter and has taken reasonable measures to ensure such awareness.

(2) Whether the manager has taken reasonable measures to ensure compliance with the law and Agency policies and regulations.

[redacted]

(b)(1)
(b)(3) CIAAct
(b)(3) NatSecAct
(b)(6)
(b)(7)(c)


Approved for Release: 2024/01/08 C05758316

(b)(1)
(b)(3) CIAAct
(b)(3) NatSecAct
(b)(6)
(b)(7)(c)

Page Denied

Approved for Release: 2024/01/08 C05758316

(b)(1)
(b)(3) CIAAct
(b)(3) NatSecAct
(b)(6)
(b)(7)(c)

Page Denied

Approved for Release: 2024/01/08 C05758316

Approved for Release: 2024/01/08 C05758316

(b)(1)
(b)(3) CIAAct
(b)(3) NatSecAct
(b)(6)
(b)(7)(c)

Page Denied

Approved for Release: 2024/01/08 C05758316

(b)(1)
(b)(3) CIAAct
(b)(3) NatSecAct
(b)(6)
(b)(7)(c)

Page Denied

Approved for Release: 2024/01/08 C05758316

(b)(1)
(b)(3) CIAAct
(b)(3) NatSecAct
(b)(6)
(b)(7)(c)

Page Denied

# RECOMMENDATION

~~(S)~~ The Director, Central Intelligence Agency should [redacted] regarding the events surrounding the death of Manadal Al-Jamaidi. [redacted]

(b)(1)
(b)(3) CIAAct
(b)(3) NatSecAct
(b)(5)
(b)(6)
(b)(7)(c)

CONCUR:

John L. Helgerson
Inspector General

3 Nov. '05
Date

Approved for Release: 2024/01/08 C05758316

Approved for Release: 2024/01/08 C05758316

Approved for Release: 2024/01/08 C05758316

Approved for Release: 2024/01/08 C05758316


Approved for Release: 2024/01/08 C05758316

APPROVED FOR RELEASE
DATE: APR 2008

FOR OFFICIAL USE ONLY

**Exhibit 4**

DECLASSIFICATION OF INFORMATION RELATING TO THE DEATH OF MANADEL AL-JAMADI UNDER SECTION 3.1(b) OF EXECUTIVE ORDER 12958, AS AMENDED

In accordance with section 3.1(b) of Executive Order 12958, as amended, I hereby declassify the following Central Intelligence Agency (CIA) intelligence information for use in the criminal investigations and prosecutions arising from the death of Manadel Al-Jamadi, an Iraqi insurgent in U.S. custody:

- The fact that CIA personnel were present during the military's capture of Al-Jamadi;
- The fact that CIA personnel questioned Al-Jamadi at the SEAL compound at Baghdad International Airport;
- The fact that CIA personnel questioned Al-Jamadi at Abu Ghraib prison;
- Statements of CIA personnel (minus their names and other classified information) regarding what they did and what they observed during the capture and questioning of Al-Jamadi; and
- The fact that the CIA Office of Inspector General is investigating allegations of impropriety in the Al-Jamadi case.

Director of Central Intelligence

4/1/05
Date

FOR OFFICIAL USE ONLY

APPROVED FOR RELEASE DATE: 06-Sep-2013

**Exhibit 5**

(b)(6)
(b)(7)(c)
(b)(1)
(b)(3)

# AGENT'S INVESTIGATION REPORT

*CID Regulation 195-1*

ROI NUMBER 0237-03-CID259-61219

Page 1 of 2 Page

DETAILS

DETAILS:

About 1030, 05 Nov 03, [redacted] interviewed [redacted] Central Intelligence Agency (CIA), who stated he arrived with his team at the Abu Ghraib Prison around 0500, 04 Nov 03. At this time according to [redacted] Mr. Manadal AL-JAMAIDI was changed from his personal clothes (stripped pants and a white shirt) into an orange detainee jumpsuit. Additionally, the flex cuffs, which he had been wearing, were removed and he was bound with standard handcuffs. [redacted] further related that Mr. AL-JAMAIDI was brought to an interrogation cell at the prison around 0530 and at this point he left [redacted] and [redacted] to continue with their interrogation of Mr. AL-JAMAIDI. [redacted] stated that he was informed at approximately 0730 by [redacted] that Mr. AL-JAMAIDI had slumped over during the interrogation and was not responsive.

About 1505, 05 Nov 03, SA [redacted] this office, interviewed [redacted] Interpreter/ Translator, CIA, who stated he was in a vehicle behind U.S. Navy Sea Air Land (SEAL) Team 7. He was unable to see the face of Mr. AL-JAMAIDI when he was apprehended from his residence. [redacted] spoke with Mr. AL-JAMAIDI moments after his arrest but did not see his face due to it being covered by a hood. [redacted] also stated he arrived at the Abu Ghraib Prison about 0400 with the apprehension team. Mr. AL-JAMAIDI was taken to a separate room where he was changed into an orange prison uniform. Shortly after this, [redacted] and [redacted] CIA, began their interrogation of Mr. AL-JAMAIDI. [redacted] stated the interrogation lasted a couple of hours. During the interrogation, Mr. AL-JAMAIDI was on his knees with his hands cuffed behind his back and his ankles were secured. At some point during the questioning, Mr. AL-JAMAIDI's head slumped to one side while he was talking. At first [redacted] and [redacted] thought Mr. AL-JAMAIDI was faking an illness. [redacted] observed that Mr. AL-JAMAIDI had stopped breathing. They then summoned assistance from U.S. Military Personnel and then departed the room.

AGENT's COMMENT: [redacted] heard that Mr. AL-JAMAIDI strongly resisted arrest by the SEAL Team.

About 1510, 05 Nov 03, SA [redacted] interviewed [redacted] who stated that he, [redacted] and [redacted] were part of a team along with SEAL Team 7, on a mission to apprehend Mr. AL-JAMAIDI at his residence. Mr. [redacted] explained that Mr. AL-JAMAIDI was once a captain in the Iraqi Army, and is currently a suspected terrorist cell leader who has a cache of some two tons of explosives, to include chemical agents, which he purported was to use in attacks against coalition forces. Additionally, [redacted] confirmed that Mr. AL-JAMAIDI was strongly suspected of facilitating logically and materially, the recent attacks against the Al Rasheed Hotel and the International Red Cross in Baghdad. [redacted] related how SEAL Team 7 raided Mr. AL-JAMAIDI's residence at approximately 0200, 4 Nov 03, and brought him to the Special Forces compound adjacent to Baghdad International Airport (BIAP). [redacted] interrogated Mr.

| TYPED AGENT'S NAME AND SEQUENCE NUMBER | ORGANIZATION | |
|---|---|---|
| [redacted] | 12th MP Detachment (CID) (DSE), 3D MP Group<br>Victory Camp, Baghdad, Iraq APO AE 09335 | |
| SIGNATURE | DATE<br>11 Sep 03 | EXHIBIT<br>[redacted] |

APPROVED FOR RELEASE DATE: 06-Sep-2013

# AGENT'S INVESTIGATION REPORT

*CID Regulation 195-1*

ROI NUMBER
0237-03-CID259-61219



DETAILS

AL-JAMAIDI for approximately one hour and garnered Mr. AL-JAMAIDI's name and that he claimed to know some of the suspected terrorist cell leaders in the Baghdad area. According to [redacted], Mr. AL-JAMAIDI was transported by the same apprehension team to the Abu Ghraib Prison at approximately 0500. At this point [redacted] stated Mr. AL-JAMAIDI was changed from his personal clothing into an orange detainee jumpsuit. At approximately 0530, [redacted] and [redacted] resumed the interrogation of Mr. AL-JAMAIDI. Some time around 0700, while answering a question, Mr. AL-JAMAIDI's head slumped over to the side. [redacted] stated Mr. AL-JAMAIDI's chest was not moving, so he removed his hood to further observe his condition. At this point [redacted] summoned the Military Police to seek medically assistance for Mr. AL-JAMAIDI. At this point, both men left the interrogation cell.

AGENT's COMMENT: [redacted] claimed he at no time observed Mr. AL-JAMAIDI's face until the removal of the hood at the Abu Ghraib Prison. Additionally, [redacted] stated that Mr. AL-JAMAIDI's face had no medical bandage upon removal of the hood. He did claim to observe the swollen and bruised condition of Mr. AL-JAMAIDI's face. [redacted] related that Mr. AL-JAMAIDI was resisting arrest and would not cooperate with the commands of the SEAL Team on several occasions. He also stated that Mr. AL-JAMAIDI's hands were bound during the interview with handcuffs, which were joined behind his back. Further, [redacted] stated that at no time during either interrogation, did Mr. AL-JAMAIDI voice any medical concerns.

//////////////////////////////////////////////////LAST ITEM//////////////////////////////////////////////////////////

| TYPED AGENT'S NAME AND SEQUENCE NUMBER | ORGANIZATION | |
|---|---|---|
| [redacted] | 12th MP Detachment (CID) (DSE), 3D MP Group<br>Victory Camp, Baghdad, Iraq APO AE 09335 | |
| | DATE<br>11 Sep 03 | EXHIBIT |

APPROVED FOR RELEASE DATE: 06-Sep-20[redacted]

[redacted] (b)(6)
(b)(7)(c)
(b)(7)(e)

# AGENT'S INVESTIGATION REPORT

CID Regulation 195-1

ROI NUMBER 0237-03-CID259-61219

PAGE 1 OF 2 PAGE

DETAILS

Basis for Investigation: About 2245, 4 Nov 03, SA [redacted] was notified by CW5 [redacted] Group Operations Officer, 3rd Military Police Group (CID), of the death of an Iraqi national at the Abu Ghraib prison.

Between 1000 and 1030, 5 Nov 03, SA [redacted] conducted a death scene examination of the prison shower on the second floor of the prison.

CHARACTERISTICS OF THE SCENE: The shower room is located on the second floor of the Abu Ghraib prison in wing A-1, along the western wall or the northern wing. The room is constructed of concrete and cinder block material with a drain along the west wall, centered between north and south. The shower room is approximately 10 foot wide and 20 foot long. The shower room has a concrete floor and a concrete ceiling. The shower room has a window along the west wall near the north end of the room. The window has bars and a cage over it to prevent anyone from escaping. The shower room has a doorway along the east wall with a door made of bars. Also along the east wall are three other doorways with bars, which have been locked shut and do not open. The shower room is equipped with two fluorescent lights along the east wall. One of the fluorescent lights did not work.

CONDITION OF THE SCENE: The shower room was clean of debris. There was a meal ready to eat box in the center of the room near the north wall. There was a plastic bag with an orange jump suit and trash located next to the door along the east wall. There was a plastic bottle of chlorine located next to the plastic bag. There was a black in color body bag along the south wall, with the deceased individual inside. There were no stains on the floor or wall area at the time of the exam. There were sheets placed over the bar doors, to prevent people from seeing into the room. There were no unusual odors detected.

ENVIRONMENTAL CONDITIONS: The temperature outside was approximately 90 degrees Fahrenheit and the sun was shining. The temperature inside was approximately 80 degrees Fahrenheit. There was no precipitation in the past twenty-four hours.

FACTORS PERTINENT TO ENTRY/EXIT: Access to the scene could only be gained through the main doorway into the shower room.

SCENE DOCUMENTATION: A crime scene sketch was prepared by SA [redacted] SA [redacted] exposed photographs of the scene utilizing a Kodak EasyShare DX4900 digital camera built in flash.

SEARCH FOR LATENT IMPRESSIONS: A search for latent impressions was not conducted due to the personnel being present at the scene not being in question.

| TYPED AGENT'S NAME AND SEQUENCE NUMBER | ORGANIZATION |
|---|---|
| | 12th MP Det. (CID), Camp Victory, Iraq<br>APO AE 09335 |
| SIGNATURE [redacted] | DATE / EXHIBIT |

CID FORM 94
1 FEB 77

FOR OFFICIAL USE ONLY

[redacted]

APPROVED FOR RELEASE DATE: 06-Sep-2016

| AGENT'S INVESTIGATION REPORT<br>CID Regulation 195-1 | ROI NUMBER<br>0237-03-CID259-61219<br>PAGE 2 OF 2 PAGE |
|---|---|

DETAILS

SEARCH BEYOND THE SCENE: A search beyond the scene was not conducted.

About 1210, 8 Nov 03, [redacted] interviewed SPC [redacted] 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, Headquarter Service Company (HSC), 109th Medical Battalion (Iowa City, Iowa), Abu Ghraib Prison, Iraq, who stated he did not remember what time the incident occurred. SPC [redacted] stated himself and SGT [redacted] responded to the hard cells reference a man who stopped breathing. SPC [redacted] stated when they arrived on scene, an Iraqi doctor was already there and was checking the body for a heart beat. SPC [redacted] stated the Iraqi doctor stated the individual was dead and no lifesaving efforts were taken. SPC [redacted] stated he did not recall seeing a bandage on the individuals face when he assisted the doctor. SPC [redacted] stated the body was laying near the shower drain, face down when he entered the shower room.

About 1245, 8 Nov 03, SA [redacted] interviewed Dr [redacted] Abu Ghraib Prison, Iraq, who stated he responded to the cell block reference one of the prisoners had stopped breathing. Dr. [redacted] stated when he arrived on scene, the man was laying on his stomach. Dr. [redacted] stated he checked the body for vital signs, which met with negative results. Dr. [redacted] stated he did not take any life saving measures once he determined the man was dead. Dr [redacted] stated the man had not been dead long, when he arrived. Dr. [redacted] stated he did notice injuries to the mans face when he was checking him for vital signs.

////////////////////////////////////////////////////LAST ENTRY////////////////////////////////////////////////////

| TYPED AGENT'S NAME AND SEQUENCE NUMBER | ORGANIZATION | |
|---|---|---|
| SA [redacted] | 12th MP Det. (CID), Camp Victory, Iraq<br>APO AE 09335 | |
| SIGNATURE | DATE | EXHIBIT |

CID FORM 94
1 FEB 77

FOR OFFICIAL USE ONLY

J1-11

UNCLASSIFIED -- APPROVED FOR RELEASE: 08 DEC 2014

**Exhibit 6**

~~SECRET//NOFORN~~

THE DIRECTOR
CENTRAL INTELLIGENCE AGENCY
WASHINGTON, D.C. 20505

27 June 2013

MEMORANDUM FOR: The Honorable Dianne Feinstein
The Honorable Saxby Chambliss

SUBJECT: (S) CIA Comments on the Senate Select Committee on Intelligence Report on the Rendition, Detention, and Interrogation Program

Chairman Feinstein,

1. ~~(S)~~ I appreciate the opportunity for the Central Intelligence Agency to comment on the Senate Select Committee on Intelligence's Study of the Agency's long-terminated Rendition, Detention, and Interrogation Program (hereafter referred to as the "Study"). As I noted during my confirmation hearing and in subsequent discussions with you and with Committee members, the lengthy Study deserved careful review by the Agency in light of the significance and sensitivity of the subject matter and, of particular concern, the serious charges made in the Study about the Agency's performance and record.

2. ~~(S)~~ As you know, one of the President's first acts in office more than four years ago was to sign Executive Order 13491, which brought to an end the program that is the subject of the Committee's work. In particular, the President directed that the CIA no longer operate detention facilities and banned the use of all interrogation techniques not in the Army Field Manual. Thus, before getting into the substance of the CIA's review of the Study, I want to reaffirm what I said during my confirmation hearing: I agree with the President's decision, and, while I am the Director of the CIA, this program will not under any circumstances be reinitiated. I personally remain firm in my belief that enhanced interrogation techniques are not an appropriate method to obtain intelligence and that their use impairs our ability to continue to play a leadership role in the world.

[redacted]

~~SECRET//NOFORN~~

UNCLASSIFIED -- APPROVED FOR RELEASE: 08 DEC 2014

SUBJECT: ~~(S)~~ CIA Comments on the Senate Select Committee on Intelligence Report on the Rendition, Detention, and Interrogation Program

3. ~~(S)~~ Nevertheless, as Director of the CIA, it is not my role to engage in a debate about the appropriateness of the decisions that were made in a previous Administration to conduct a detention and enhanced interrogation program of suspected terrorists following the attacks on 11 September 2001. Rather, it is my responsibility to review the performance of the CIA with regard to the program and to take whatever steps necessary to strengthen the conduct as well as the institutional oversight of CIA covert action programs. This is the perspective I took when reviewing CIA's comments on the Study.

4. ~~(S)~~ The CIA's comments on the Study were the result of a comprehensive and thorough review of the Study's 20 conclusions and 20 case studies. In fulfilling my pledge to you, I want you to have the full benefit of the overall findings and recommendations of the Agency review team (TAB A) as well as the team's analysis of each of the Study's 20 conclusions and 20 case studies (TABS B and C, respectively). I strongly encourage you as well as all Committee Members and Staff to read the entirety of the Agency's comments.

5. ~~(S)~~ I have carefully reviewed and concur with the Agency's comments, which I would like to summarize briefly. First of all, we agree with a number of the Study's conclusions. In particular, we agree that the Agency:

- Was unprepared and lacked core competencies to respond effectively to the decision made in the aftermath of the 9/11 attacks that the Agency undertake what would be an unprecedented program of detaining and interrogating suspected Al Qa'ida and affiliated terrorists. This lack of preparation and competencies resulted in significant lapses in the Agency's ability to develop and monitor its initial detention and interrogation activities. These initial lapses, most of which were corrected by 2003 and have been the subject of multiple internal and external investigations, were the result of a failure of management at multiple levels, albeit at a time when CIA management was stretched to the limit as the CIA led the U.S.

SUBJECT: ~~(S)~~ CIA Comments on the Senate Select Committee on Intelligence Report on the Rendition, Detention, and Interrogation Program

Government's counterterrorism response to the 9/11 attacks against the Homeland;

- Struggled to formulate and gain policy approval for a viable plan to move detainees out of Agency-run detention facilities;

- Failed to perform a comprehensive and independent analysis on the effectiveness of enhanced interrogation techniques;

- Allowed a conflict of interest to exist wherein the contractors who helped design and employ the enhanced interrogation techniques also were involved in assessing the fitness of detainees to be subjected to such techniques and the effectiveness of those same techniques;

- Detained some individuals under a flawed interpretation of the authorities granted to CIA, and;

- Fell short when it came to holding individuals accountable for poor performance and management failures.

6. ~~(S)~~ Notwithstanding the above areas of agreement, there are several areas of disagreement as well. In particular, the Agency disagrees with the Study's unqualified assertions that the overall detention and interrogation program did not produce unique intelligence that led terrorist plots to be disrupted, terrorists to be captured, or lives to be saved. The Study's claims on this score are inconsistent with the factual record, and we provide detailed comments in TAB C on where and why the Study's assertions and representations are wrong.

- The Agency takes no position on whether intelligence obtained from detainees who were subjected to enhanced interrogation techniques could have been obtained through other means or from other individuals. The answer to this question is and will forever remain unknowable.

SUBJECT: (~~S~~) CIA Comments on the Senate Select Committee on Intelligence Report on the Rendition, Detention, and Interrogation Program

- After reviewing the Committee Study and the comments of the Agency review team, and as I indicated at the outset of this memorandum, I personally remain firm in my belief that enhanced interrogation techniques are an inappropriate method for obtaining intelligence. Moreover, it is my resolute intention never to allow any Agency officer to participate in any interrogation activity in which enhanced interrogation techniques would be employed.

7. (~~S~~) Regarding the Study's claim that the Agency resisted internal and external oversight and deliberately misrepresented the program to Congress, the Executive Branch, the media, and the American people, the factual record maintained by the Agency does not support such conclusions. In addition, the Study's conclusion regarding CIA's misrepresentations of the program rely heavily on its flawed conclusion regarding the lack of any intelligence that flowed from the program. Nevertheless, we do agree with the Study that there were instances where representations about the program that were used or approved by Agency officers were inaccurate, imprecise, or fell short of Agency tradecraft standards. Those limited number of misrepresentations and instances of imprecision never should have happened.

8. (~~S~~) As a result of the Committee's Study and our review, I have approved and the CIA has started to implement eight recommendations made by the Agency review team, which are included in TAB A. It is critically important that the Agency leadership team take immediate steps to prevent any shortcomings in Agency covert action programs, as flawed performance--on the part of the Agency as an institution or by individual Agency officers--can have devastating consequences. In addition, our review team is ready to brief Committee members as well as meet with Committee staff at any time to walk through our comments.

9. (U) I sincerely hope that, as a result of the Committee's work and our subsequent review and comments, we can take steps to enhance the Agency's ability to meet successfully the ever-growing array of intelligence and national security

UNCLASSIFIED -- APPROVED FOR RELEASE: 08 DEC 2014



SUBJECT: ~~(S)~~ CIA Comments on the Senate Select Committee on Intelligence Report on the Rendition, Detention, and Interrogation Program

challenges that face our Nation. By learning from the past while focusing on the future, we will be able to best meet our mutual responsibility to protect and advance the national security interests of the American people. As always, I look forward to working with you and the entire Committee on these important matters.

John O. Brennan





UNCLASSIFIED -- APPROVED FOR RELEASE: 08 DEC 2014

UNCLASSIFIED -- APPROVED FOR RELEASE: 08 DEC 2014



SUBJECT: (S) CIA Comments on the Senate Select Committee on Intelligence Report on the Rendition, Detention, and Interrogation Program

Attachment

cc: Denis McDonough, Assistant to the President and Chief of Staff
Kathy Ruemmler, Assistant to the President and Counsel to the President
The Honorable Mike Rogers
The Honorable Dutch Ruppersberger
Thomas Donilon, Assistant to the President for National Security Affairs
James R. Clapper, Director of National Intelligence





UNCLASSIFIED -- APPROVED FOR RELEASE: 08 DEC 2014

**(U) Conclusion 4: The CIA avoided effective oversight of its detention and interrogation activities by the CIA's Office of Inspector General. The CIA resisted efforts by the Inspector General to examine aspects of the CIA detention and interrogation program, and provided significant inaccurate information to the Office of Inspector General during the drafting of the Inspector General's Special Review of the program. The inaccurate information was included in the final May 2004 Special Review. In 2005, CIA Director Porter Goss directed the Inspector General not to initiate any new reviews of the program until it had completed the reviews already underway. In 2007, CIA Director Michael Hayden conducted an unprecedented review of the CIA's Office of Inspector General, largely in response to its inquiries into the CIA detention and interrogation program.**

(U) We do not agree with the *Study's* assessment that it avoided effective oversight of its detention and interrogation activities by its Office of Inspector General (OIG). CIA engagement's with the OIG over the years was robust and the Agency did not block institutional or individual cooperation. Throughout the period, the OIG affirmed in its Semiannual Reports that it found full and direct access to all Agency information relevant to the performance of its duties. Had circumstances been otherwise, the IG would have been obligated to make that fact known to Congress. As further evidence of this access, the OIG produced a wealth of assessments, which were made available not only to CIA senior leadership but also to Congressional overseers from 2003, when the first OIG RDI-related review began, to 2012 when the last OIG RDI-related investigation was concluded. We acknowledge that two DCIA's did engage with the OIG with respect to its efforts on the RDI program, but, in both cases, this reflected an effort to find an appropriate balance between OIG's mission and those of other CIA components.

~~(S//OC/NF)~~ OIG oversight included counterterrorism audit, inspection, and numerous investigations that resulted in both positive and negative findings on the conduct of the RDI program.

- (U~~/FOUO~~)The comprehensive Special Review, *"Counterterrorism Detention and Interrogation Activities (September 2001-October 2003),"* was published in May 2004.

- ~~(S//OC/NF)~~ The OIG conducted nearly 60 investigations on RDI-related matters. In over 50, OIG found the initial allegations to be unsubstantiated or otherwise did not make findings calling for accountability review. Of the remaining cases, one resulted in a felony conviction, one resulted in termination of a contractor and revocation of his security clearances, and six led to Agency accountability reviews.

(U~~//FOUO~~) The *Study* is correct in noting that the OIG's work resulted in some tension within CIA. However, on balance we concluded that, although CIA officers may not have been comfortable engaging with the IG on RDI-related matters, when they did so they nevertheless generally provided accurate information on the operation and effectiveness of the program.

- ~~(S//OC/NF)~~ Some CIA officers clearly did perceive a lack of objectivity on the part of some OIG officers who were evaluating the program. In a memorandum for the record dated 25 August 2005, a CTC officer stated that an OIG officer opined that Gul Rahman had been "killed" and that the OIG officer "appeared to have presumed ill intent" with regard to the role of CIA officers. [redacted]

- (U/~~FOUO~~) This is only a small part of the story, however. Many OIG investigations associated with the RDI program were initiated as a result of concerns expressed by Agency employees working in the program, evidence that employees believed they could reach out to OIG and have their views taken seriously. Many allegations were found to be unsubstantiated, and did not lead to OIG Reports of Investigation.

- ~~(S//OC/NF)~~ We assess that CIA officers, with rare exceptions, provided accurate assessments to the OIG. The *Study's* assertion to the contrary is simply reflective of its more general conclusion that CIA repeatedly misrepresented the effectiveness of the program. There were two factual errors conveyed to OIG by CIA officers for the 2004 Report that we did not rectify at the time. We address both of these issues in detail in our response to the *Study's* Conclusion 9 and in our comments on the Case Studies. As discussed there, we disagree with the *Study's* overall appraisal of our representations.

- ~~(S//OC/NF)~~ Finally, it is worth highlighting that OIG reviews included instances in which the OIG recommended that individuals be reviewed for lack of candor during the course of the investigations. In four of those instances, the review process confirmed there had been a lack of full cooperation and candor, and the individuals involved were given disciplinary sanctions. Accountability is further discussed in our response to Conclusion 16.

~~(S//OC/NF)~~ The *Study's* contention that actions by two DCIAs were intended to impede OIG's activities is also flawed. DCIA Goss did send a memo on 21 July 2005 with a request that the OIG not begin new reviews of the Counterterrorism Center and instead address the backlog of uncompleted OIG RDI work. He noted that he was "increasingly concerned about the cumulative impact of the OIG's work on CTC's performance." His request came at a time when OIG claims on CTC attention and resources were growing as a result of an increasing number of reviews, some of which were taking months or longer, even as intelligence indicated, and events on the ground demonstrated, that al Qa'ida was reconstituting itself. The DCIA's request thus sought to strike a balance between the critical missions both OIG and CTC had to perform.

- ~~(S//OC/NF)~~ It is worth underscoring that DCIA Goss's request ultimately had no impact on the OIG's role. A 25 July 2005 response memo from the Inspector General (IG), in which the IG resolutely held his ground, ended the matter. Our records indicate the OIG did not halt or reduce its efforts.

~~(S//OC/NF)~~ DCIA Hayden's engagement sought to address and clarify competing missions. OIG's active posture sparked debate regarding its role vis-a-vis other CIA components. As a result, Director Hayden in 2007 initially tasked Special Counselor Robert Dietz to assess how OIG and OGC interacted on legal issues. This was intended to address the issue of whether the CIA was being caught between OIG and OGC as differing sources of "final" legal guidance. Also at the time, an Accountability Board, convened in response to an OIG report of investigation on the death of detainee Manadal al-Jamaidi, received complaints of alleged OIG bias and unfair treatment of CIA officers. Dietz was subsequently asked to include those complaints as part of his review.

- (S//OC/NF) Dietz's review included a number of recommendations intended to strengthen the methodology and conduct of OIG investigations, and the results of the review were reported in writing to the HPSCI and SSCI Chairmen and Vice Chairmen in January 2008.

(U//FOUO) The IG accepted over a dozen recommendations from the review, and implemented actions intended to clarify, document, strengthen and increase transparency, primarily related to the conduct of OIG investigations. These included:

- (U//FOUO) Establishing the position of a Quality Control Officer in the Investigations Staff and the creation of an OIG Ombudsman position separate from the Quality Control Officer.

- (U//FOUO) Establishing procedures allowing individuals or components to provide rebuttals for the purpose of establishing factual accuracy, and establishing a uniform procedure allowing the subjects of reports the opportunity to review their interview reports and subsequent draft investigation reports.

- (U//FOUO) Acquisition of audio/video equipment allowing for the taping of investigations interviews, to ensure accuracy and clarity, and protect both interviewees and investigators in the event of disagreements about interview content.