**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| SETH HETTENA, Plaintiff, | ) | |
| v. | ) | Civil Action No. 22-3589 (ABJ) |
| CENTRAL INTELLIGENCE AGENCY, Defendant. | ) | |

# <u>MEMORANDUM OPINION</u>

Plaintiff Seth Hettena brought this action against the Central Intelligence Agency ("CIA") under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, seeking the release of four documents related to the death of Manadel al-Jamadi.[1] Compl. [Dkt. # 1] ¶ 1. The CIA has produced all four documents, but withheld portions of them under FOIA Exemptions 1, 3, 5, 6, 7(C), and 7(E). *See* Def.'s *Vaughn* Index, Ex. 1l to Decl. of Mary C. Williams [Dkt. # 17-13] ("*Vaughn* Index").

Now pending before the Court are the parties' motions for summary judgment regarding the agency's withholdings on two of the documents. Def.'s Mot. for Summ. J. [Dkt. # 17] ("Def.'s Mot."); Pl.'s Cross-Mot. for Summ. J. [Dkt. # 22] ("Pl.'s Cross-Mot."). The motions are fully briefed. Def.'s Mem. of Points & Authorities in Supp. of Def.'s Mot. [Dkt. # 17] ("Def.'s Mem."); Pl.'s Mem. in Opp. to Def.'s Mot. & in Supp. of Pl.'s Cross-Mot. [Dkt. # 22-1] ("Pl.'s Mem. and

1 Defendant uses both "al-Jamaidi" and "al-Jamadi" in its submissions. *Compare* Def.'s Mot. at 22 ("Mr. al-Jamaidi") *with* Def.'s Reply at 8 ("Mr. al-Jamadi"). Some of the documents released by the CIA refer to al-Jamadi as "al-Jamaidi." *See, e.g.*, Ex. 1 to Decl. of Seth Hettena [Dkt. # 22-2] ("Ex. 1") at 1. Plaintiff, when he is not quoting the CIA's documents, uses "al-Jamadi." *See* Pl.'s Mot. at 3. For consistency, the Court will use "al-Jamadi" unless it is directly quoting a source that uses "al-Jamaidi."

Opp."); Def.'s Reply in Supp. of Def.'s Mot. and Combined Opp. to Pl.'s Cross-Mot. [Dkt. # 26] ("Def.'s Reply and Opp."); Pl.'s Reply in Supp. of Pl.'s Cross-Mot. [Dkt. # 28] ("Pl.'s Reply").

For the reasons stated below, defendant's motion for summary judgment will be **GRANTED** and plaintiff's cross-motion for summary judgment will be **DENIED**.

## BACKGROUND

The information plaintiff seeks in this case arises from the death of Manadel al-Jamadi, an "Iraqi detainee" who died during an interrogation by the CIA at Abu Ghraib Prison ("Abu Ghraib") on November 4, 2003. CIA Office of Inspector General Report, Ex. 3 to Decl. of Seth Hettena [Dkt. # 22-2] ("Inspector General Report") at 2. Earlier that day, al-Jamadi was captured at his residence in Iraq by Navy SEAL Team 7, and he was transported to Abu Ghraib for questioning. *Id.* at 2–3. At the prison, al-Jamadi's wrists were handcuffed behind his back and, "at the request of the [CIA] interrogator," shackled to a window that was above and behind him. *Id.* at 3. His head was also covered by a hood that had been placed on him to restrict his vision during his capture. *Id.* at 64, 66. After "approximately one and a half hours" of questioning, al-Jamadi "slump[ed] toward the floor," and the CIA interrogator sought the assistance of the U.S. Military Police Officers stationed nearby. *Id.* at 64. The officers discovered that al-Jamadi had died. *Id.*

A deputy medical examiner for the Armed Forces conducted an autopsy and ruled al-Jamadi's death a homicide. *Id.* at 2. The autopsy determined that the death "resulted from blunt force injuries to the torso complicated by compromised respiration." *Id.* at 3. The medical examiner concluded that "the position in which [a]l-Jamadi was placed during the interrogation exacerbated his otherwise serious but non-life-threatening internal injuries." *Id.* at 2, 45.

Two investigations ensued. First, on November 5, 2003, the U.S. Army Criminal Investigation Division ("CID") began its investigation into the circumstances surrounding al-

Jamadi's death, which included interviews with the CIA officials involved. Agent's Investigation Report, Ex. 5 to Decl. of Seth Hettena [Dkt. # 22-2] ("CID Report") at 1–4. The interviews were summarized in written investigative reports, and the CIA has released "lightly redacted" versions of those reports in response to a separate FOIA request by the American Civil Liberties Union. Decl. of Seth Hettena, Pl.'s Cross-Mot. [Dkt. # 22-2] ("Hettena Decl.") ¶¶ 13–14; *see* CID Report.

The CIA Office of the Inspector General ("OIG") also investigated al-Jamadi's death. *See* Ex. 4 to Hettena Decl. [Dkt. # 22-2] ("Ex. 4") at 1. That investigation concluded with a report ("Inspector General Report") issued on November 5, 2004 that included, among other things, the OIG's findings on: (1) the "events surrounding the death of al-Jamaidi"; and (2) the "federal criminal laws and CIA policies and regulations relevant to [a]gency personnel in their treatment of Al-Jamaidi and [in] their actions in this investigation." Inspector General Report at 26.

The Inspector General Report prompted further investigation in 2007 by the "Special Accountability Board" ("Board"), in response to complaints of alleged "bias and unfair treatment of CIA officers" during the Inspector General's investigation. Ex. 6 to Decl. of Seth Hettena [Dkt. # 22-2] ("Ex. 6") at 8. The Special Accountability Board is a body convened by the CIA Director, Deputy Director, and Assistant Deputy Director to "review a particular event or incident involving" the agency's "alleged failures" and "assist management in . . . determining the appropriate response." Decl. of Mary C. Williams, Attachment 1 to Def.'s Mot. [Dkt. # 17-2] ("Williams Decl.") ¶¶ 41, 41 n.4. The CIA convened a Special Accountability Board to review and write a report on the OIG's investigation, Ex. 6 at 8, and the Board issued its "Report and Recommendation . . . Regarding the Death of Iraqi Detainee Al-Jamaidi" ("Board Report") to the Associate Deputy Director. Ex. 1 to Hettena Decl. [Dkt. # 22-2] ("Board Report") at 1.

After reviewing the Board's report, the Assistant Inspector General of the CIA wrote a memorandum to the Inspector General entitled "Comments on Report and Recommendations of the Special Accountability Board Regarding the Death of Iraqi Detainee Manadal al-Jamaidi" ("Comments Memorandum"). Ex. 2 to Hettena Decl. [Dkt. # 22-2] ("Comments Memorandum") at 1. The memorandum "comment[ed] on issues raised" by the Board Report and two other reports "concerning the Agency's review of accountability for the events surrounding" al-Jamadi's death. *Id.*

Plaintiff is an author and investigative journalist who is writing a book about al-Jamadi's death and its aftermath. Hettena Decl. ¶¶ 3–4. When conducting research for that project, he submitted three FOIA requests to the CIA seeking: (1) the Inspector General's "concluding document . . . of an investigation of the nonregistration of detainees"; (2) a memorandum regarding the "Quality and Objectivity of Office of Inspector General Investigations"; (3) the "Report and Recommendation of the Special Accountability Board Regarding the Death of Iraqi Detainee Al-Jamaidi"; and (4) the "Comments on Report and Recommendations of the Special Accountability Board Regarding the Death of Manadal al-Jamaidi." Ex. 1 to Compl. [Dkt. # 1-1]; Ex. 4 to Compl. [Dkt. # 1-1]. Although the CIA acknowledged each request, *see* Ex. 2 to Compl. [Dkt. # 1-1]; Ex. 5 to Compl. [Dkt. # 1]; Ex. 6 to Compl. [Dkt. # 1-1], it did not respond to any of the requests within the twenty-day statutory time limit. 5 U.S.C. § 552(a)(6)(A).

On November 29, 2020, plaintiff filed suit against the CIA alleging that it failed to issue a determination on the FOIA requests, failed to conduct a reasonable search, and failed to produce the requested records. *See* Compl. at 6–8. Defendant answered the complaint, *see* Answer [Dkt. # 7], and then searched for "potentially responsive" records. Joint Status Rep. [Dkt. # 12] at 1. Eventually, the CIA released heavily redacted versions of all four records. Joint Status Rep.

[Dkt. # 13] at 1; *see Vaughn* Index. In connection with its consideration of the pending summary judgment motions, the Court has reviewed all four documents *in camera*.

## STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted). To defeat summary judgment, the non-moving party must "designate specific facts showing that there is a genuine issue for trial." *Id.* at 324 (internal quotation marks omitted).

The mere existence of a factual dispute is insufficient to preclude summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). A dispute is "genuine" only if a reasonable fact-finder could find for the non-moving party; a fact is "material" only if it is capable of affecting the outcome of the litigation. *Id.* at 248; *Laningham v. U.S. Navy*, 813 F.2d 1236, 1241 (D.C. Cir. 1987). In assessing a party's motion, the court must "view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the summary judgment motion.'" *Scott v. Harris*, 550 U.S. 372, 378 (2007) (alterations omitted), quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962) (per curiam).

"The rule governing cross-motions for summary judgment . . . is that neither party waives the right to a full trial on the merits by filing its own motion; each side concedes that no material facts are at issue only for the purposes of its own motion." *Sherwood v. Wash. Post*, 871 F.2d

1144, 1147 n.4 (D.C. Cir. 1989) (alteration in original), quoting *McKenzie v. Sawyer*, 684 F.2d 62, 68 n.3 (D.C. Cir. 1982). In assessing each party's motion, "[a]ll underlying facts and inferences are analyzed in the light most favorable to the non-moving party." *N.S. ex rel. Stein v. District of Columbia*, 709 F. Supp. 2d 57, 65 (D.D.C. 2010), citing *Anderson*, 477 U.S. at 247.

FOIA cases are typically and appropriately decided on motions for summary judgment. *See Brayton v. Office of the U.S. Trade Rep.*, 641 F.3d 521, 527 (D.C. Cir. 2011). In FOIA cases, the agency bears the ultimate burden of proof. *See U.S. Dep't of Just. v. Tax Analysts*, 492 U.S. 136, 142 n.3 (1989). The Court may award summary judgment based solely on information provided in an agency's affidavits or declarations that identify "the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith." *Military Audit Project v. Casey*, 656 F.2d 724, 738 (D.C. Cir. 1981). These affidavits or declarations are accorded "a presumption of good faith, which cannot be rebutted by 'purely speculative claims about the existence and discoverability of other documents.'" *SafeCard Servs., Inc. v. S.E.C.*, 926 F.2d 1197, 1200 (D.C. Cir. 1991), quoting *Ground Saucer Watch, Inc. v. CIA*, 692 F.2d 770, 771 (D.C. Cir. 1981).

When considering a motion for summary judgment under FOIA, the Court must conduct a de novo review of the record. *See* 5 U.S.C. § 552(a)(4)(B).

## ANALYSIS

The Freedom of Information Act requires that "each agency, upon any request for records which (i) reasonably describes such records and (ii) is made in accordance with published rules . . . shall make the records promptly available to any person." 5 U.S.C. § 552(a)(3)(A). If a record, or a piece of information contained in a record, falls into one of FOIA's nine statutory

exemptions, the agency may withhold that information. 5 U.S.C. § 552 (b)(1)–(9). When an agency withholds information, it must justify the withholding under the applicable statutory exemption, *Vaughn v. Rosen*, 484 F.2d 820, 825–28 (D.C. Cir. 1973), and the Court must "ascertain whether the agency has sustained its burden of demonstrating" that the withholding is proper. *Assassination Archives & Research Ctr. v. Central Intel. Agency*, 334 F.3d 55, 57 (D.C. Cir. 2003).

Plaintiff challenges the CIA's withholdings with respect to two of the documents: (1) the "Report and Recommendation of the Special Accountability Board Regarding the Death of Iraqi Detainee Al-Jamaidi" ("Board Report"); and (2) the "Comments on Report and Recommendations of the Special Accountability Board Regarding the Death of Manadal al-Jamaidi" ("Comments Memorandum"). *See* Def.'s Statement of Undisputed Material Facts [Dkt. # 17-1] ("Def.'s SOF") ¶ 5; Pl.'s Resp. to Def.'s SOF [Dkt. # 22-4] ¶ 5. The CIA almost completely redacted the Board Report under Exemptions 1, 3, 5, 6, and 7(C), and it heavily redacted the Comments Memorandum under Exemptions 1, 3, 6, 7(C), and 7(E). *Vaughn* Index at 2–3. Plaintiff "does not contest the CIA's redaction of names and identifying information under the[] exemptions," but he does dispute the agency's withholdings under Exemptions 1, 3, 5, and 7(E). Pl.'s Cross-Mot. at 7.

The Court finds that the CIA properly withheld all the information it redacted in the Board Report and the Comments Memorandum under Exemptions 1, 3, 5, and 7(E). First, the Board Report withholdings were proper under Exemption 5 because the material fell squarely within the deliberative process privilege, and the agency satisfied its burden of showing foreseeable harm from its disclosure. Second, the withholdings from the Board Report and the Comments Memorandum under Exemptions 1 and 3 were proper because the agency demonstrated that disclosure would harm national security interests and violate the National Security Act. Third, the

withholdings from the Comments Memorandum under Exemption 7(E) were justified because the agency showed that the information was gathered for law enforcement purposes, that it contained law enforcement techniques and procedures, and that disclosure would create a risk of circumvention of the law.

Finally, the Court's *in camera* review of the Board Report and Comments Memorandum confirmed that the CIA did not withhold officially acknowledged information, and that none of the exempted information could be reasonably segregated from any non-exempt information.

## I. The CIA properly withheld information from the Board Report under Exemption 5.

All but two of the CIA's redactions in the Board Report were withheld under Exemption 5 as covered by the deliberative process privilege. *See* Board Report at 1–18.

Exemption 5 permits an agency to withhold "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5). An agency can withhold information under the exemption if: (1) its source is a government agency; and (2) it falls "within the ambit of a privilege against discovery under judicial standards that would govern litigation against the agency that holds it." *Dep't of Interior & Bureau of Indian Affairs v. Klamanth Water Users Protective Ass'n*, 532 U.S. 1, 8 (2001). The exemption encompasses the "protections traditionally afforded [to] certain documents pursuant to evidentiary privileges in the civil discovery context," including the executive "deliberative process privilege." *Taxation with Representation Fund v. Internal Revenue Service*, 646 F.2d 666, 676 (D.C. Cir. 1981).

"The deliberative process privilege rests on the obvious realization that officials will not communicate candidly among themselves if each remark is a potential item of discovery." *Klamanth*, 532 U.S. at 8–9, quoting *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 151 (1975). Its

purpose "is to enhance 'the quality of agency decisions' by protecting open and frank discussion among those who make them within the Government," *id.*, and it does so by "shield[ing] from disclosure documents reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated[.]" *Sears, Roebuck & Co.*, 421 U.S. at 150 (internal quotation marks omitted).

To be shielded by the deliberative process privilege, the withheld "materials [must be] both predecisional and deliberative." *Tax Analysts v. Internal Revenue Service*, 117 F.3d 607, 616 (D.C. Cir. 1997). "A document is predecisional if it was 'prepared in order to assist an agency decisionmaker in arriving at his decision,' rather than to support a decision already made." *Petroleum Info. Corp. v. U.S. Dep't of Interior*, 976 F.2d 1429, 1434 (D.C. Cir. 1992), quoting *Renegotiation Bd. v. Grumman Aircraft*, 421 U.S. 168, 184 (1975). And material is deliberative if it "reflects the give-and-take of the consultative process." *Campaign Legal Ctr. v. Dep't of Justice*, 34 F.4th 14, 23 (D.C. Cir. 2022) (citation and internal quotation marks omitted). To meet its burden under the deliberative prong, the government must "explain the role" the document "played in administrative decisionmaking – the 'who, what, where, and how' of internal governmental deliberations." *Id.*, quoting *Judicial Watch, Inc. v. U.S. Dep't of Just.*, 20 F.4th 49, 57 (D.C. Cir. 2021).

**a. The Board Report was predecisional and deliberative.**

While there is no dispute that the Board Report was an "interagency" document, *see* Pl.'s Mot. at 21 n.6, plaintiff argues that the CIA's withholdings were improper because it gave "no inkling of what the purported decision and decision-making process were." Pl.'s Mot. at 21.

That is not a fair characterization of the agency's submissions. Its declaration explained that the report was "prepared by the Special Accountability Board," which is a body that is

convened by the CIA Director, Deputy Director, and Assistant Deputy Director to "review a particular event or incident involving alleged failures of fundamental CIA missions or responsibilities" and "assist management in assessing and determining the appropriate course of action in response." Williams Decl. ¶¶ 41, 41 n.4. Here, the Board "convened to review the events surrounding the death" of al-Jamadi, and its report "contains [its] views, deliberations, assessments, and recommendations" regarding "specific CIA personnel" and agency "policies, procedures, and practices" related to the Inspector General's investigation of the incident. *Id.* ¶ 41.

Contrary to plaintiff's assertion, the CIA has adequately described both the pre-decisional and deliberative nature of the Board Report, and the "decision-making process" involved. The report was pre-decisional in that it was created by the Special Accountability Board to aid agency leadership in deciding how to respond to the CIA's involvement in al-Jamaidi's death and the Inspector General's investigation. It was deliberative in that the Report reviewed the circumstances surrounding the incident and the OIG investigation to provide recommendations regarding the specific personnel and policies involved. And while plaintiff is correct that the agency must "establish[] what deliberative process is involved," *Pavement Coatings Tech Council v. U.S. Geological Surv.*, 995 F.3d 1014, 1021 (D.C. Cir. 2021), it is not required to identify a "single, discrete decision" to which the document contributed; rather, the agency's burden is "identifying the decisionmaking process to which . . . [the] memorandum contributed." *Access Reports v. Dep't of Justice*, 926 F.2d 1192, 1196 (D.C. Cir. 1991) (emphasis in original). The agency has carried its burden here, and the Court's *in camera* review further confirms the document falls squarely within the deliberative process privilege.

**b. The agency properly withheld factual material in the Board Report.**

Plaintiff also asserts that the agency has failed to meet its burden under the deliberative process privilege because it did not "account for non-deliberative factual information that the [Board Report] plainly contains." Pl.'s Cross-Mot. at 14, 16–17.

While "[p]urely factual material usually cannot be withheld under Exemption 5," *Ancient Coin Collectors Guild v. Dep't of State*, 641 F.3d 504, 513 (D.C. Cir. 2011), an agency is not required to disclose factual material that "is so inextricably intertwined with the deliberative sections of [the] document[] that its disclosure would inevitably reveal the government's deliberations." *In re Sealed Case*, 121 F.3d 729, 737 (D.C. Cir. 1997). "[P]redecisional materials, even if 'factual' in form," are still protected under Exemption 5 if they "reflect an agency's preliminary positions or ruminations about how to exercise discretion on some policy matter." *Petroleum Information Corp. v. U.S. Dep't of Interior*, 976 F.2d 1429, 1435 (D.C. Cir. 1992).

Here, the Court's *in camera* review confirms that the facts contained in the Board Report were so intertwined with the report's analysis that the agency could not have reasonably segregated any additional portions of the record. The discussion of the factual circumstances of al-Jamadi's death and particularly the Inspector General's investigation "were as much part of the deliberative process as the actual recommendations and advice" contained in the report, and therefore, the factual information is "equally protected from disclosure." *Mead Data Cent., Inc. v. U.S. Dep't of Air Force*, 566 F.2d 242, 257 (D.C. Cir. 1977).

**c. The CIA has demonstrated foreseeable harm.**

Finally, plaintiff argues that the CIA's withholdings under Exemption 5 were improper because it failed to show that disclosure would foreseeably harm the agency by impeding its internal deliberations. Pl.'s Cross-Mot. at 17–18.

Under the FOIA Improvement Act of 2016, 5 U.S.C. § 552(8)(A), an agency may not withhold "even . . . privileged materials unless it also 'reasonably foresees that disclosure would harm an interest protected by'" Exemption 5. *Reps. Comm. for Freedom of the Press v. Federal Bureau of Investigation*, 3 F.4th 350, 369 (D.C. Cir. 2021), quoting 5 U.S.C. § 552(a)(8)(A). The "requirement imposes an independent and meaningful burden on agencies," to "articulate both the nature of the harm from release[,] and the link between the specified harm and specific information contained in the material withheld." *Id.* (citations, alterations, and internal quotations omitted). "In the context of withholdings made under the deliberative process privilege, the foreseeability requirement means that agencies must concretely explain how disclosure 'would' – not 'could' – adversely impair internal deliberations." *Id.*, citing *Machado Amadis v. U.S. Dep't of State*, 971 F.3d 364, 371 (D.C. Cir. 2020).

The CIA has met its additional burden under Exemption 5. Its declaration explained that the Board Report contained the "options and approaches" that the Board "recommended to senior Agency decision-makers" in responding to the Inspector General's investigation of al-Jamadi's death. Williams Decl. ¶ 43. The declaration further explained that the release of this specific information would impair internal agency deliberations by "allow[ing] for a comparison" of the Board's "proposed recommendations with the government's ultimate decision on the subject." *Id.* That is exactly the type of harm that the deliberative process privilege is meant to prevent by "assur[ing] agency staff that they can provide their candid opinions and recommendations to

decisionmakers without fear of ridicule or reprisal." *Reporters Committee*, 3 F.4th at 361. This is particularly important in the instant situation, when the communications implicate matters of national security, foreign relations, and techniques and procedures for law enforcement investigations, all of which call for particular care and candor in internal decision-making.

Plaintiff argues that the agency's foreseeable harm cannot materialize because it "has never disclosed what decision it made, if any, in response to" the Board Report, so the public cannot "actually compare the CIA's proposed decision with its final one." Pl.'s Cross-Mot. at 24. But the circumstances surrounding al-Jamadi's death, the OIG's investigation, and the fact that the CIA convened the Special Accountability Board to review OIG's investigation are public knowledge. So the Board Report's observations and recommendations regarding the incident could certainly be compared to what, if anything, is known about the agency's response, or lack thereof, and that would give rise to the harm contemplated by the deliberative process privilege – public scrutiny hampering the candid communication of government officials engaged in important decision-making processes.

Plaintiff also asserts that the foreseeable harm identified by the agency is "implausibl[e]" because "the name of the Board Report's author" is redacted and therefore "there is no perceptible risk that the public will ever know who wrote the Board Report." Pl.'s Cross-Mot. at 18. This suggestion ignores the nature of the interest that the deliberative process privilege protects, which is the "*agency*'s internal deliberations," *Machado Amadis*, 971 F.3d at 371 (emphasis added), not the concern of any particular individual within the agency. And although the names of the author and the recipient of the Board Report are redacted, their titles are not, so there is "perceptible risk" that the public could connect the document to the individuals involved.

Therefore, the Court finds that the agency has met its burden to show that it is reasonably foreseeable that disclosure would harm an interest protected by Exemption 5.

## II. The CIA properly withheld information from the Board Report and Comments Memorandum under Exemptions 1 and 3.

The CIA withheld the rest of the information redacted in the Board Report, and all of the disputed information in the Comments Memorandum under Exemptions 1 and 3. *See* Board Report at 1, 18; Comments Memorandum at 1–11. Plaintiff argues the documents likely contain information regarding the CIA's "possible cover-up in connection with al-Jamadi's death" and "alleged misconduct by" the Office of Inspector General, and he asks the Court to segregate and release that information. Pl.'s Mot. at 8, 9 n.2.

### a. Exemption 1

Exemption 1 protects from disclosure materials that are "authorized . . . by an Executive Order to be kept secret in the interest of national defense or foreign policy and . . . are in fact properly classified pursuant to such Executive [O]rder." 5 U.S.C. § 552(b)(1). Here, the CIA has classified the information in the Board Report and Comments Memorandum under Executive Order No. 13,326. Def.'s Mot. at 4–5; Williams Decl. ¶¶ 25–26.

Under Executive Order 13,526, materials can be classified and withheld if "(1) an original classification authority is classifying the information; (2) the information is owned by . . . the United States Government; (3) the information falls within one or more of the categories of information" listed in the Executive Order; and (4) disclosure "reasonably could be expected to result in damage to the national security." Exec. Order 13,526 § 1(a)(1)–(4). As relevant to the CIA's withholdings, the specific categories of information protected by the Executive Order include: "intelligence activities (including covert actions), intelligence sources or methods," *id.* §

1.4(c), and "foreign relations or foreign activities of the United States, including confidential sources." *Id.* 1.4(d).

The agency bears the burden of showing that it withheld "only such material as conforms to the [Executive's Order] substantive criteria for classification." *King v. U.S. Dep't of Justice*, 830 F.2d 210, 214 (D.C. Cir. 1987). But in situations where an agency withholds information to protect national security, the Supreme Court has directed that the government's decision is "worthy of great deference" because it is "familiar with 'the whole picture'" and "judges are not." *Central Intel. Agency v. Sims*, 471 U.S. 159, 179 (1985). Indeed, the D.C. Circuit has directed that "the [agency's] arguments need only be both 'plausible' and 'logical' to justify the invocation of a FOIA exemption in the national security context." *ACLU v. U.S. Dep't of Def.*, 628 F.3d 612, 624 (D.C. Cir. 2011), quoting *Wolf v. CIA*, 473 F.3d 370, 374–75 (D.C. Cir. 2007).

Here, the agency's declaration has carried its burden under Exemption 1. First, the agency's declarant, Acting Information Review Officer Mary C. Williams, stated that she is "an original classification authority," that she "determined" the information withheld was "currently and properly classified," and that the information was "owned by and . . . under the control of the U.S. Government." Williams Decl. ¶ 26. Then, the declaration notes the specific types of information in the withholdings that fall into the Executive Order's enumerated categories, including: "CIA covert personnel, locations of Agency facilities, intelligence activities overseas, relationship with foreign partners, and/or methods for collecting foreign intelligence." Williams Decl. ¶ 28.

Finally, the declaration explains how the disclosure of each type of information could harm national security. *Id.* ¶¶ 29–33. Disclosure of covert personnel could "expose the intelligence activities with which they have been involved" and "jeopardize the clandestine nature of the

Agency's intelligence activities," *id.* ¶ 29; disclosing CIA facilities could damage the agency's relationships with the governments of the countries in which they are located, which "harm[s] the CIA's continued ability obtain accurate and timely foreign intelligence," *id.* ¶ 30; disclosure of intelligence activities, particularly activities occurring abroad, could be used by "[t]errorist organizations" and other "hostile groups" to "thwart CIA activities and attack the United States, *id.* ¶ 31; disclosure of agency intelligence methods neutralizes their "usefulness" and "significantly degrade[s]" the CIA's ability to apply those methods, *id.* ¶ 32; and disclosing foreign liaison relationships "would risk the loss of specific . . . relationships that are critical to confronting threats to [the country's] national security." *Id.* ¶ 33. Given the deference owed the agency in matters of national security, the Court finds that these explanations logically and plausibly justify its withholdings under Exemption 1.

The Court's *in camera* review further confirms that the agency properly asserted Exemption 1, and that the information withheld cannot be reasonably segregated from any other information contained in the report. Therefore, plaintiff's argument that the Court should segregate the information he believes to be contained the Board Report and Comments Memorandum from the properly exempted information fails.

**b. Exemption 3**

Exemption 3 allows an agency to withhold materials "specifically exempted from disclosure by statute," as long as the statute requires withholding "in such a manner as to leave no discretion on the issue" or "establishes particular criteria for withholding or refers to particular types of matters to be withheld." 5 U.S.C. § 552(b)(3). Under the exemption, the agency "need only show that the statute claimed is one of exemption as contemplated by Exemption 3 and that the withheld materials falls within the statute." *Larson v. Dep't of State*, 565 F.3d 857, 865 (D.C.

Cir. 2009). All of the CIA's redactions in the Board Report and Comments Memorandum under Exemption 3 were withheld pursuant to the National Security Act, 50 U.S.C. § 3024(i)(1), the Central Intelligence Agency Act ("CIA Act"), 50 U.S.C. § 3507, or, in most cases, both. *See* Board Report at 1–18; Comments Memorandum at 1–11.

To start, "[b]oth the National Security Act and the CIA Act qualify as Exemption 3 statutes." *DiBacco v. U.S. Dept. of the Army*, 234 F. Supp. 3d 255, 276 (D.D.C. Jan. 18, 2017). The National Security Act requires "[t]he Director of National Intelligence" to "protect intelligence sources and methods from unauthorized disclosure." 50 U.S.C. § 3024(i)(1). And the CIA Act exempts the agency from disclosing "the organization, functions, names, official titles, salaries, or numbers of personnel employed by the Agency." 50 U.S.C. § 3507. Both statutes establish criteria by which the agency can and should withhold particular pieces of information from disclosure, and they can therefore serve as bases for Exemption 3 withholdings.

Here, the Court has already found that the agency's withholdings of its intelligence sources and methods were proper under Exemption 1, and it further finds that the agency properly withheld the same information under the National Security Act. As explained above, the agency's declaration has adequately stated that the Board Report and Comments Memorandum contain both intelligence methods and sources, and it described in detail the harms the agency would suffer if it were forced to disclose that material. Williams Decl. ¶¶ 31–33, 37. And the D.C. Circuit has directed that the Court owes "even greater deference" to the CIA's "assertion of harm to intelligence sources and methods under the National Security Act" than under Executive Order 13,526. *Wolf v. Central Intel. Agency*, 473 F.3d 370, 377 (D.C. Cir. 2007), citing *Central Intel. Agency v. Sims*, 471 U.S. 159, 168–69 (1985); *see id.* at 377–78 (*Glomar* response under the National Security Act was proper because the CIA's affidavit "satisfie[d] the requirements of

Exemption 1" and there was "greater deference afforded [to] the Agency" under the statute). The Court's *in camera* review of the documents further confirms the propriety of the agency's withholdings under the National Security Act, and again, it was not possible to segregate the exempt material from any other non-exempt material. Therefore, the agency properly withheld the material redacted from the Board Report and the Comments Memorandum.

Given its finding under the National Security Act, the Court does not need to analyze the agency's withholdings under the CIA Act. The information that the CIA withheld under only the CIA Act were names and other identifying information that the plaintiff does not dispute. Pl.'s Cross-Mot. at 7.

**III. The CIA properly withheld information from the Comments Memorandum under Exemption 7(E).**

The CIA also withheld information from the Comments Memorandum under Exemption 7(E). *See* Comments Memorandum at 2–10.

Exemption 7 protects from disclosure "records or information compiled for law enforcement purposes." 5 U.S.C. § 552(b)(7). "To show that the . . . documents were compiled for law enforcement purposes, the [agency] need only establish a rational nexus between [an] investigation and one of the agency's law enforcement duties and a connection between an individual or incident and a possible security risk or violation of federal law." *Blackwell v. FBI*, 646 F.3d 37, 40 (D.C. Cir. 2011) (citations and internal quotation marks omitted)

Exemption 7(E) specifically protects the disclosure of law enforcement records "to the extent that the production of such . . . records or information . . . would disclose techniques and procedures for law enforcement investigations or prosecutions . . . if such disclosure could reasonably be expected to risk circumvention of the law." 5 U.S.C. § 552(b)(7)(E). The exemption "sets a relatively low bar for the agency to justify withholding." *Blackwell*, 646 F.3d at 42. "Rather

than requiring a highly specific burden of showing how the law will be circumvented, [E]xemption 7(E) only requires that the [agency] demonstrate logically how the release of the requested information might create a risk of circumvention of the law." *Mayer Brown, LLP v. Internal Revenue Serv.*, 562 F.3d 1190, 1194 (D.C. Cir. 2009).

In this case, the agency has sufficiently justified its withholdings under Exemption 7(E). First, it has shown that the information in the Comments Memorandum was compiled for law enforcement purposes. The memorandum contained "information about the procedures and methods followed by the OIG special agents during their investigation into the death of Mr. al-Jamaidi." Williams Decl. ¶ 57. And the Inspector General Report states that it analyzed the "federal criminal laws . . . relevant to agency personnel in their treatment of al-Jamaidi and their actions in this investigation." Inspector General Report at Report at 26. So, there is a "rational nexus" between the information in the Comments Memorandum regarding the Inspector General's investigation of al-Jamadi's death, and the possible violations of federal law committed by the CIA personnel involved.

Next, the agency has shown "logically how the release of the requested information might create a risk of circumvention of the law." The CIA's declarant specified that the withholdings contain "information about the procedures and methods followed by the OIG special agents during their investigation into the death of Mr. al-Jamaidi, including the specific Agency policies, procedures and guidelines relied on by the OIG investigators; specific information reviewed; and their engagement and cooperation with other identified [United States government] agencies." Williams Decl. ¶ 57. It then explained that disclosure "would reveal when, how, and to what extent OIG special agents review and assess specific databases and documents," and that this information "could be used to try to circumvent those techniques and procedures," "neutralize their

effectiveness," or "evade detection in the future." *Id.* ¶ 58. This satisfies the "relatively low bar" that the agency must meet, and the Court's *in camera* review again confirms that the agency's withholdings were proper and that the law enforcement information was not segregable from any non-exempt material.

## IV. The agency did not improperly withhold officially acknowledged information.

In addition to challenging the agency's FOIA exemptions, plaintiff argues that the CIA must "release all information contained in the Board Report and the Comments [Memorandum] that it has officially acknowledged." Pl.'s Mot. at 12–13. Specifically, he argues that the redactions in the Board Report and Comments Memorandum "likely" contain information that was been officially released by the CIA in: (1) the Inspector General Report; (2) the Army Criminal Investigation Division's Report; and (3) a "declassification order" released by the CIA Director. *Id.* at 12.

The doctrine of official acknowledgement "provides that when an agency has officially acknowledged otherwise exemption information through prior disclosure," it "has waived its right to claim an exemption with respect to that information." *Am. C.L. Union v. Central Intel. Agency*, 710 F.3d 422, 426 (D.C. Cir. 2013). To be "officially acknowledged" though, the information requested must: (1) "be as specific as the information previously released"; (2) "match the information previously disclosed"; and (3) "already have been made public through an official and documented disclosure." *Fitzgibbon v. Central Intel. Agency*, 911 F.2d 755, 765 (D.C. Cir. 1990).

Defendant argues that it has never released the contents of the Board Report or Comments Memorandum, and that the information that has been previously disclosed is not specific enough to meet the standard for official acknowledgment. Def.'s Reply at 6–7. The Court's *in camera* review of the documents confirms that neither of the highly redacted documents contain

information that matches what was made publicly available in the Inspector General Report, the CID Report, or the declassification order. Plaintiff's assumption that the documents must have recited whole chunks of the public records verbatim fail to appreciate the fact that each record had a different purpose and focus: the OIG report described what happened to al-Jamadi at Abu Ghraib; the Special Accountability Board report – prepared at the behest of the CIA Director, Deputy Director, and Assistant Deputy Director – reviewed the OIG investigation and provided recommendations; and then an Assistant Inspector General of the CIA wrote a memorandum to the Inspector General commenting on what the Board had to say.

Since the Court finds that there has been no previous official disclosure of the material withheld when the two documents at issue were produced, the withholdings are not subject to attack on that basis.

## CONCLUSION

For the foregoing reasons, the Court will **GRANT** defendant's motion for summary judgment [Dkt. # 17], and it will **DENY** plaintiff's cross-motion for summary judgment [Dkt. # 22]. A separate order will issue.

AMY BERMAN JACKSON
United States District Judge

DATE: June 17, 2025